Gerald Singleton (WA 59010)
gsingleton@singletonschreiber.com
Stephen J. Hill (WA 7651)
shill@singletonschreiber.com
SINGLETON SCHREIBER, LLP
450 Alaskan Way South, Ste. 200
Seattle, WA 98104
Tel. (206) 466-0809

Meagan Verschueren (CA 313117) *Pro Hac Vice applicant*
mverschueren@singletonschreiber.com
Katie Llamas (CA 303983) *Pro Hac Vice applicant*
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE,

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| JANE DOE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> G6 Hospitality Property, LLC; G6 Hospitality, LLC; G6 Hospitality IP, LLC; G6 Hospitality Purchasing, LLC; G6 Hospitality Franchising, LLC; Motel 6 Operating, LP; SeaTac Hotels, LLC; HSK212, LLC; Lala Salama Hospitality, Inc., Wyndham Hotels and Resorts, Inc.; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: <br><br> Unlimited Jurisdiction <br><br> **COMPLAINT FOR DAMAGES AND INJURIES** <br><br> **JURY TRIAL DEMANDED** <br><br> **Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE, by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## **INTRODUCTION**

1.      For years, sex trafficking ventures have openly operated in and out of hotels throughout the United States.

2.      For years, hotel brand companies have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3.      Criminals parade their misconduct openly at certain hotel and motel properties throughout the United States, and the hotels and motels profit from providing harbor for the underlying heinous crimes. The hotel and hospitality industry continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such known criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4.      Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

5.      As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

6.      Jane Doe files this civil lawsuit seeking compensation and justice for the harms she suffered as a result of being sex trafficked and sold for sex at hotels owned, operated, managed, and controlled by Defendants and their agents and employees.

## PARTIES

7.      Jane Doe is a natural person who was trafficked for sex in the State of Washington. Jane Doe is a survivor of sex trafficking. From 2017 to 2019, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

    a.  Due to the sensitive and private nature of, and the likely retaliatory response to, these allegations, this Complaint identifies Jane Doe by a pseudonym only. Jane Doe will move the Court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe's true identity in order to protect Jane Doe and her identity.

    b.  Generally, pleadings must state the name of all parties.[2] However, exceptions exist when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

    c.  To maintain her privacy and safety, Jane Doe should not be compelled to disclose her identity. Jane Doe's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe would be in danger of being forced back into

---

[2] Fed. R. Civ. P. 10(a).
[3] See WA Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis
Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).
[4] See WASHINGTON cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action or that she is speaking out about what happened to her. Moreover, Defendants will not be prejudiced. Jane Doe will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe's claims once the parties have entered into a protective order.

8.     Defendant SeaTac Hotels, LLC is a for-profit Washington corporation with its principal place of business in SeaTac, Washington. SeaTac Hotels, LLC owned and operated the Motel 6 hotel located at 18900 47th Avenue South, SeaTac, Washington.

9.     Defendants Motel 6 Operating, L.P., G6 Hospitality Property LLC, and SeaTac Hotels, LLC, will collectively be referred to as "Motel 6 Defendants."

10.    Defendant HSK212, LLC is a for-profit Nevada corporation with its principal place of business in Reno, Nevada. HSK212, LLC owned and operated the Hawthorn Suites located at 6329 S 212th Street, Kent, Washington from about 2018 to 2021.

11.    Defendant Lala Salama Hospitality, Inc. is a for-profit Washington corporation with its principal place of business in Edmonds, Washington. Lala Salama Hospitality, Inc. owned and operated the Hawthorn Suites located at 6329 S 212th Street, Kent, Washington from about 2013 to 2018.

12.    Together and hereinafter, HSK212, LLC and Lala Salama Hospitality, Inc. will be referred to as "Hawthorn Suites Owners" or "Hawthorn Suites Defendants."

13. Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

14. Defendant G6 Hospitality, IP, LLC is a for profit Delaware corporation with its principal place of business in Carrollton, Texas.

15. Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant G6 Hospitality Property, LLC owned, operated, and controlled the Motel 6 hotel located at 20651 Military Road South, SeaTac, Washington during all relevant times.

16. Defendant G6 Hospitality Purchasing, L.L.C., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

17. Defendant G6 Hospitality Franchising, L.L.C. is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

18. Defendant Motel 6 Operating, L.P., is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant Motel 6 Operating, L.P. owned, operated and controlled the Motel 6 hotel located at 16500 Pacific Highway South, Seattle, Washington from at all relevant times.

19. Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C. and Motel 6 Operating, L.P. will collectively be referred to as "G6 Defendants."

20. G6 Defendants are registered to do business in the State of Washington and may be served at Cogency Global Inc., 1780 Barnes Blvd. SW, Tumwater, Washington 98512.

21. Upon information and belief, G6 Defendants and its brand Motel 6® properties include the locations at 20651 Military Road South, SeaTac, Washington; 16500 Pacific Highway South, Seattle, Washington; and 18900 47th Avenue South, SeaTac, Washington. From 2017 to 2019, G6 Defendants transacted business in

King County, Washington, and purposefully availed itself to King County, Washington, and the citizens of King County, Washington, through Motel 6®.

22.    Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is a for profit Delaware corporation with its principal place of business in Parsippany, New Jersey and can be served through its registered agent in Wilmington, Delaware.

    a.  Wyndham is a corporation that brands, instructs, controls, and contracts with about 9,000 branded properties for profit, including Hawthorn Suites and specifically the Hawthorn Suites where Plaintiff was trafficked for years.

    b.  Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retained successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation. Where applicable, references to Wyndham in this complaint also refers to Wyndham Worldwide Corporation.

    c.  Upon information and belief Wyndham Hotels and Resorts, Inc. properties included the Hawthorn Suites at 6329 S 212th Street, Kent, Washington, 98032. From 2017 and through 2019, Wyndham Hotels and Resorts, Inc. transacted business in King County, Washington, and purposefully availed itself to King County, Washington, and the citizens of King County, Washington, through Hawthorn Suites.

23.    Defendants, G6 Hospitality, L.L.C., G6 Hospitality IP, L.L.C., G6 Hospitality Property, L.L.C., G6 Hospitality Purchasing, L.L.C., G6 Hospitality Franchising, L.L.C., Motel 6, Inc., Operating, L.P., and Wyndham Hotels and Resorts, Inc will collectively be referred to as "Parent Hotel Defendants."

## JURSIDCITION AND VENUE

24.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

25.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, led to injuries that occurred in the judicial district where this action is brought.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the King County, Washington, and all Defendants are registered to do business and were doing business in Washington.

## SEX TRAFFICKING UNDER FEDERAL LAW

27.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

28.     The requirements for liability under the TVPRA on a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

29.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

---

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

30.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age." 22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

## The Hotel Industry Has Played a Significant Role in the Sex Trafficking Industry for Decades.

31.     Human trafficking, including sex trafficking, has been prevalent at hotels and motels for decades.  Hotel and motel owners, operators and controllers have known about it for decades. Traffickers have used hotels and motels to sell their victims for decades because numerous hotels and motels have knowingly allowed it to happen and failed to report or stop it so that the hotels and motels could continue to regularly profit from the room rentals.

32.     For decades, numerous hotel and motel owners, operators and controllers have accommodated traffickers by accepting cash payments nightly from traffickers for extended stays; giving them two rooms next to each other so that one can be used by buyers to have their way with victims each night; giving rooms away from other guests; warning traffickers about police activity and stings; calling traffickers to come back when police have left the properties; lying to the police and public about trafficking that occurs at their properties; not reporting criminal activity and the trafficking that they observe; and participating as buyers by paying for sex with victims and/or giving traffickers rooms in exchange for sex with victims.

33.  In 2017, human trafficking was noted as the world's fastest growing crime.  While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone earns an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.

34. The hospitality industry plays a crucial role in the sex trade. Hotels have long profited from their reputations as havens of privacy and discretion for the offenders. Despite the known risks and known trafficking crimes, hotels, including the Defendants, have offered and continue to offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular. Hotels, including the Defendants, knowingly harbor traffickers, including sellers and buyers, and victims.

35. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens. For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."

36. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. Traffickers and buyers alike frequently use hotel rooms to exploit victims.

37. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of commercial exploitation of children.

38. Due to the overall hospitality industry's participation, complacency, complicity, negligence, intentional wrongful acts and reckless disregard related to sex trafficking, hotels are the venue of choice for sex trafficking. Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

39. Every day, thousands of hotel employees witness signs of sex trafficking and commercial exploitation. Thus, the hospitality industry has the

greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur—which is on their property and in their view.

40. Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to do so and negligently or knowingly choose to participate in the sex trade for profits. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

41. Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels. The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.

42. The complicity and participation of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection by law enforcement. Sex trafficking ventures move from place to place, and usually from hotel to hotel, so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotels and hotel chains, including the hotels named in this complaint — they know it is unlikely that they will be disturbed and highly unlikely that hotels will act to protect victims. Instead, hoteliers protect traffickers and profits.

43. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel

industry, including Defendants, on best practices for identifying and responding to sex trafficking.

44.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

45.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants have been aware of or should have been aware of since before Plaintiff was trafficked, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking so that it can be stopped.  Signs include but are not limited to:

a.    Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b.    Individuals show signs of physical abuse, restraint, and/or confinement;

c.    Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.    Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.    Individuals lack freedom of movement or are constantly monitored;

f.    Individuals avoid eye contact and interaction with others;

g.    Individuals have no control over or possession of money or ID;

h.    Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.      Individuals have few or no personal items—such as no luggage or other bags;

j.      A group of girls appears to be traveling with an older female or male;

k.      A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

l.      Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

m.      Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;

n.      Possession or use of multiple cell phones;

o.      Possession or use of large amounts of cash or pre-paid cards;

p.      Inability to come and go freely from the hotel;

q.      People watching others from vehicles or by loitering around the premises;

r.      Solicitation in and around the hotel;

s.      Money exchanged in common areas, including hallways, lobbies, and parking lots;

t.      Women dressed provocatively and accompanied by men;

u.      Men or women with weapons;

v.      Multiple non-guest men coming in and out of a particular hotel room;

w.      Signs of injury on men or women whom seem to be controlled or watched by others;

x.      Sexual supplies including lubricants and devices in rooms visible to cleaning staff;

y.      Towels with blood;

z.      Excess towels and sheet requested per night;

aa.      Excessive condoms in trash taken by cleaning staff;

bb.    Signs of verbal and physical abuse, including yelling, screaming, and signs of physical injury;

cc.    Women appearing to be under the influence of drugs or alcohol while being transported in and out of the hotel or taken from room to room;

dd.    Asking for rooms away from other guests;

ee.    Asking for rooms with separate entrances/exits that can be propped open for non-guests;

ff.    Paying cash on a nightly basis or in increments for extended periods of time;

gg.    Paying with stolen credit cards; and

hh.    Paying with credit cards online that are not in hand or do not have a matching ID.

46.    At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that were observed by and observable by Defendants.

47.    Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties where Plaintiff was trafficked, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of the hotels.

48.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, brands, owners, operators and employees can identify and respond to this trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking

reasonable steps to identify and prevent trafficking in its hotels, is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

49.     The United States is ranked one of the worst countries in the world for human trafficking according to a 2019 report released by the Department of State.

50.     Washington is one of the top states in the country for the number of reported human trafficking cases.

51.     The Asian American Hotel Owners Association, Washington Hospitality Association, and dozens of other hotel associations have had a complete guide and trainings on how to prevent human trafficking at hotels for several years, including during the times and before Plaintiff was trafficked at Defendants' hotels and motels.

52.     The decades-old problem still exists, and defendants are still participating in sex trafficking ventures.

53.     In 2015, another survivor was trafficked at the Motel 6 on 47th Avenue and brought a lawsuit against the owners and parent companies earlier this year.

54.     In 2019, Sea-Tac Airport and King County Metro significantly increased the number of ads and posters raising awareness of the increased sex trafficking problem in the area at the airport and on buses.  The campaign was focused on trying to give hope and resources to victims of sex trafficking.

55.     In 2019, Mar Brettmann, the executive director of Businesses Ending Slavery and Trafficking in Seattle said "trafficking is a huge problem in our region. We know that 300 to 500 kids are prostituted at any given time in King County." The proper term is "sex trafficked."

56.     The same Motel 6 locations where Plaintiff was trafficked were sued in about 2019 by a minor who was trafficked there.

57.     In 2019, the subject Motel 6 located at 18900 47th Avenue South, Seattle, Washington was in the news twice because two separate men were busted for felony sex trafficking, including one that trafficked a minor at that Motel 6.

58.     In 2022, KOMO news reported that a man was arrested in the SeaTac area after trafficking several minors in the Seattle area.

59.     In 2024, Councilmember Tammy Morales spoke out about the human trafficking problem in the Seattle areas.  The City enacted two ordinances that would prevent anyone with prostitution-related arrests from going into the international district, downtown or the Aurora neighborhoods because these are areas that have been known to the City for decades to be heavily used by traffickers to traffic drugs and people.

60.     KIRO 7 News reported in 2023 that a prostitution sting lead to a dozen men being arrested in SeaTac, including along International Boulevard where one of the main Motel 6s was located and near all the rest.

61.     In 2023, an undercover operation near the SeaTac airport resulted in the rescue of nine trafficking victims and the arrest of four traffickers who had been operating in the area.

62.     The same three Motel 6 locations where Plaintiff was trafficked were sued in 2024 by another survivor that was trafficked from about 2015 to at least 2021 at all of the three locations.

63.     The same three Motel 6 locations sued by Plaintiff herein were also sued by another survivor this year that was trafficked at all three regularly from approximately 2012 to 2016.

**Defendants Participated in a Sex Trafficking Venture that Involved Abusing and Trafficking Jane Doe by Forcing and Coercing Jane Doe to Engage in Commercial Sex for Their Benefit.**

64.     Starting in about 2017, Plaintiff was subjected to sex trafficking at the Motel 6 at 20651 Military Road South, Seattle, Washington; Motel 6 at 16500 Pacific Highway South, Seattle, Washington; Motel 6 at 18900 47th Avenue South, Seattle, Washington; and Hawthorn Suites by Wyndham at 6329 S 212 Street, Kent, Washington.

65.     Plaintiff was forced into trafficking when she was taken at gunpoint by her trafficker while waiting outside a convenience store. She was forced into the car and taken to the Motel 6 located at 20651 Military Road South, Seattle, Washington where she was held for approximately one week at gunpoint. The trafficking started almost immediately. When her trafficker first checked into this hotel Plaintiff stood next to him while he held the gun close to her, looking terrified.

66.     Plaintiff would often check in at the front desk with her trafficker and she looked scared, timid, nervous, and sad.

67.     For approximately two years, Plaintiff's trafficker rotated between these hotels. These hotels were used by Plaintiff's traffickers for days and sometimes weeks at a time, encountering the same staff.

68.     During this time, Plaintiff was under the control of her traffickers and endured multiple beatings, threats, and mental manipulation. Plaintiff was physically abused often.

69.     During her trafficking, she was shot in the leg while at the Motel 6 located at 18900 47th Avenue South, SeaTac, Washington. Her trafficker continued to force her to have commercial sex. Her Trafficker forced her to wrap her leg and continue having commercial sex. He did not allow her to seek medical assistance, her gunshot wound got infected and left a scar because of the lack of medical treatment. The gun shot would have been heard, and Plaintiff would have been seen limping around injured at each of the Defendant Hotel Locations after she was shot.

70. Plaintiff was burned multiple times with a cigarette, leaving her with visible wounds and eventual scars.

71. Plaintiff was consistently beaten by her trafficker, which would be loud events and regularly left visible bruises and marks on different parts of her body.

72. Plaintiff's trafficker would threaten to hurt or kill her family if she did not comply with his demands.

73. One of the other girls with Plaintiff's traffickers was shot in the mouth, giving Plaintiff even more reason to be terrified of and controlled by fear of her trafficker. She believed he killed girls that did not comply.

74. Plaintiff managed to escape her trafficker once but before she could find a safe place to go, he quickly found her and took her hostage again and the trafficking continued at the subject hotels listed herein.

75. Plaintiff's Trafficker would often get two rooms and/or request certain rooms at each hotel. He was known by the hotel employees.

76. At the Hawthorn Suites by Wyndham at 6329 S 212 Street, Kent, Washington, Plaintiff's trafficker specifically knew someone working at the front desk. Plaintiff's trafficker just had to call this employee directly to get the room or rooms he wanted and did not even have to check in at the front desk.

77. While staying at the subject three Motel 6s and the Hawthorn Suites, Plaintiff's trafficker would post advertisements online offering Plaintiff for commercial sex acts to occur at the hotels and communicated with "johns" responding to the advertisements. While staying at the subject hotels, Plaintiff was forced to be raped for money numerous times per day at all hours of the day and night.

78. With each stay at the subject three Motel 6 locations and the Hawthorn Suites, several consistent red flags were visible and audible to the hotel employees at each location, including but not limited to: paying for stays in cash;

paying for extended stays on a day-to-day basis; requesting certain rooms away from guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff's room at all times during the day and night; visible and audible signs of physical abuse; women and Plaintiff wearing clothing inappropriate for the weather; loud noises of abuse and other violence audible to staff and other rooms; not providing proper identifications; sad and sick looking women and girls being escorted to and from the property; men with weapons; money exchanges in open areas around the property; and men lingering and watching.

79.    These red flags were open and obvious to anyone working at the subject three Motel 6 locations and the subject Hawthorn Suites location, and it lasted for two years. Plaintiff was able to notice others being trafficked at the hotels too.

**Motel 6 Defendants and G6 Defendants Knew About and Participated in the Sex Trafficking of Plaintiff and Others at the Subject Three Motel 6 Locations.**

80.    Motel 6 Defendants and G6 Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the subject three Motel 6 locations they owned and operated because the trafficking was the direct result of Motel 6 Defendants and G6 Defendants' facilitation of Plaintiff's trafficking at the subject locations.

81.    From 2017 through 2019, the following two Motel 6s were owned and operated by the parent G6 companies, Motel 6 Operating, L.P. and G6 Hospitality Property, LLC: Motel 6 at 16500 Pacific Highway S., Seattle, Washington; and Motel 6 at 20651 Military Road, S., Seattle, Washington.  Motel 6 Operating, L.P. and G6 Hospitality Property, LLC knew that Plaintiff and other women and

children were being trafficked for sex at these two Motel 6 locations and directly observed, overheard, and witnessed the same by and through their agents, managers, and employees from 2017 through 2019, as well as before and after. G6 Defendants, by and through Motel 6 Operating, L.P. and G6 Hospitality Property, LLC knew and should have known that Plaintiff was being trafficked regularly at the subject Motel 6 properties.

82. From 2017 through 2019, SeaTac Hotels, L.L.C. owned, operated and controlled the Motel 6 where Plaintiff was trafficked located at 18900 47th Ave S., Seattle, Washington. SeaTac and G6 Defendants knew that Plaintiff and other women and children were being trafficked for sex at this Motel 6 from 2017 through 2019, as well as before and after.

83. Motel 6 Defendants and G6 Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Motel 6 Defendants and G6 Defendants ratified these acts and omissions because each failed to exercise reasonable care in the hiring, training, supervision, and retention of these employees given the specific risks known and reported to Motel 6 Defendants and G6 Defendants of sex trafficking occurring that the subject three Motel 6 locations.

84. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, including the trafficking of Plaintiff, Motel 6 Defendants and G6 Defendants continued renting rooms for profit to these traffickers, including the rooms used to sexually exploit victims.

85. Motel 6 Defendants and G6 Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with their traffickers by providing them with a venue in the

form of hotel rooms and related services, to harbor and facilitate the sexual exploitation and trafficking of her.

86.    Motel 6 Defendants and G6 Defendants also facilitated widespread trafficking at their motel locations, including the trafficking of Plaintiff in ways including:

a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, retaining, and disciplining front line staff regarding issues related to human and sex trafficking;

b. Inadequate and inadequately enforced sex trafficking notice and training for motel staff;

c. Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures and its own claimed policies and procedures so as to support an environment without accountability; and

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the motel staff and openly traffic women and children with the motel staff's assistance.

87.    Upon information and belief, during the times Plaintiff was trafficked at the subject properties, G6 Defendants participated directly in aspects of the daily operations of those subject hotels that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a. G6 Defendants assumed responsibility and control over the human trafficking response of their subject motel properties,

including but not limited to design, implementation, and mandates of practices related to trafficking, safety and security procedures, employee and franchisee education, training and response, partnership with external organizations, security, reporting, and advocacy;

b. G6 Defendants retained control over when its branded motels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded motel locations;

c. G6 Defendants retained control over determining which motels needed additional training or other resources based on the risk of trafficking occurring and other related criminal activity;

d. G6 Defendants retained control to terminate hotel staff and/or a franchising agreement based on the response to human and sex trafficking;

e. G6 Defendants determined whether the training was provided, when it was provided, the content of the training, how the training was delivered, who received it, and the consequences of someone not participating or failing to follow such training;

f. G6 Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel locations, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

g. During the time Jane Doe was trafficked at 16500 Pacific Highway S., Seattle, Washington; and 20651 Military Road

South, Seattle, Washington, G6 Defendants Motel 6 Operating L.P. and G6 Hospitality Property, LLC directly owned and operated the motels, and the remaining G6 Defendants also controlled the day to day operations.

88.    As a direct and proximate result of these egregious practices on the part of the Motel 6 Defendants and G6 Defendants, Plaintiff and numerous other victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

89.    Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their branded properties, including the subject properties named herein.

90.    Use of the G6 Defendants' branded properties for sex trafficking is well known to Defendants. Upon information and belief, before and at the time Plaintiff was trafficked at the subject Motel 6 properties, each of the Motel 6 and G6 Defendants monitored criminal activity occurring at the branded hotels and were aware of activity indicating commercial sex, sex trafficking, and related crimes occurring at those branded hotels, including the specific three Motel 6 properties where Plaintiff was trafficked.

91.    Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their brand properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms victims were

trafficked in without ID; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking or taking any steps to prevent or stop it.

92.    Defendants have access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

93.    Information that has become public through news stories establishes the entrenched and pervasive nature of Defendants' role in providing a venue where sex trafficking has continued unabated for several years. Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff.

94.    During the period Plaintiff was trafficked at the subject locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking and those signs were on display consistently to Motel 6 and G6 Defendants.

95.    Other women and girls were being trafficked for sex at the same hotels at the same time as Plaintiff and many had been trafficked at the subject three Motel 6 locations before Plaintiff.  Other women have come forward and sued Motel 6 Defendants and G6 Defendants for being trafficked at some or all of these three subject Motel 6 properties before and after Plaintiff.

96.    Plaintiff's traffickers were often present with Plaintiff at check in and would linger around the hotel or in the parking lot while Plaintiff was forced to have sex with buyers at the subject hotels. Plaintiff would look scared, timid, nervous, abused, battered and sad. This was all in plain sight of Defendants' employees at the subject locations. Plaintiff's traffickers could be seen leaving the

room when another male arrived and then returning as soon as that male left. This would happen multiple times a day, nearly every day, for two years.

97.     There was heavy foot traffic in and out of the rooms where Plaintiff was being harbored. This foot traffic involved men who were not hotel guests. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees that were located at front desks and around the Motel 6 properties. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen and did see it by and through their employees and agents.

98.     There were obvious signs of trafficking consistent with sex trafficking and which included well known "red flags" for trafficking in a hotel, such as condoms, sex paraphernalia, foot traffic, loitering, lingering, money exchanges, abuse, excess bedding and towels, bloody bedding and towels, and lingerie. These things were not only visible to but must have been seen by hotel employees entering and cleaning the rooms or even just collecting the trash, towels and linens.

99.     When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, and scared. Her traffickers were always watching her, and her noticeable demeanor was visible to hotel employees they passed by.

100.     Upon information and belief, at all times relevant, multiple employees at the subject Motel 6 locations named herein, including management-level and parent company employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

101.    As such, Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject Motel 6 locations named herein. A jury will likely find that they knew and at the very least, should have known.

102.    A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue to receive evidence and reports that human trafficking is a known issue at their Motel 6 locations.

103.    A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 Defendants paid to settle a public nuisance lawsuit related to such trafficking filed by the City of Los Angeles.[6]

104.    The Los Angeles nuisance settlement required G6 Defendants to change policies that were facilitating sex trafficking.[7] G6 Defendants knew from that lawsuit, from many prior lawsuits, and from their personal knowledge about sex trafficking at their properties that their policies were facilitating sex trafficking. Based on information and belief, at all times relevant in this Complaint and currently, G6 Defendants failed to at the time Plaintiff was trafficked and have still failed to adequately implement and enforce such changes.

105.    Public statements of G6 Defendants confirm that they knew before and during the sex trafficking of Plaintiff that sex trafficking is a problem in the hotel industry, sex trafficking was occurring at their branded hotels, and that they retained control over the response of their branded hotels to this problem. G6 Defendants recognized that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[8] They also

---

[6] Motel 6 pays $250,000 to settle human trafficking suit (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.
[7] *Id.*
[8] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

acknowledged the significant role G6 Defendants have in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels.[9]

106.    G6 Defendants acknowledge on its website that it controls the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its Motel 6 Brand motels, including the subject Motel 6 Defendant properties where Plaintiff was trafficked and abused regularly for two years.[10]

107.    G6 Defendants acknowledge on its website that it did and does control the policies, procedures, training, and codes of conduct that have facilitated sex trafficking at its branded hotels.[11]

108.    Among some of the notable press involving frequent use of Motel 6 and other G6 hotels for illegal trafficking activity, the following was noted:

> a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[12]
>
> b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[13]
>
> c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[14]

---

[9] *Id.*

[10] https://g6hospitality.com/combating-human-trafficking/

[11] *Id.*

[12] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

[13] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[14] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[15]

e. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[16]

f. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[17]

g. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[18]

h. Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[19]

i. In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[20]

j. Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had

---

[15] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.

[16] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[17] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[18] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[19] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[20] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

seventy-five (75) arrests on its property for crimes including sex-trafficking.[21]

k. Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[22]

l. In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[23]

m. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[24]

n. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[25]

---

[21] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015)https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[22] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[23] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[24] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[25] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

o.  In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[26]

p.  In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[27]

q.  Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[28]

r.  In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[29]

s.  In 2019, two different men were arrested within a week of one another and charged with sex trafficking a woman and a child out of the subject Motel 6 located at 18900 47th Ave S., Seattle, Washington—one of victims was just fourteen (14) years old.[30]

t.  In 2019, Motel 6 parent companies, including G6 Defendants, were implicated in a lawsuit in Washington in which they were sued by the state for violating the privacy of their guests by turning over guest information to ICE law enforcement without warrants.  G6 Defendants' representative claimed publicly that

---

[26] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.
[27] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.
[28] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[29] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.
[30] Prosecutor: SeaTac Motle 6 Used for Sex Trafficking, KIRO 7 News Seattle, (May 17, 2019), https://www.kiro7.com/news/local/prosecutor-seatac-motel-6-used-for-sex-trafficking/94906749/.

they turned over the information because they believed it would lead to the arrest of criminals, including sex traffickers, thus admitting they believed sex traffickers were at their properties.

u.  In 2019, a minor sex trafficking victim sued the subject Motel 6 locations, including the Motel 6 Defendants and some G6 Defendants for being sex trafficked at the same three subject Motel 6s that Plaintiff was trafficked for sex.  There, the minor victim alleged that the subject three Motel 6s at issue herein, allowed her to be brutally trafficked for sex from twelve (12) years old to fourteen (14) years old with up to twenty (20) adult men coming and going per day to rape her. To save face, after that lawsuit was filed, a "Motel 6 spokesperson" claimed "Trafficking of people violates basic human rights and constitutes a global societal problem in which multiple stakeholders must partner in order to eradicate this problem. Motel 6 takes a proactive, zero-tolerance stance on human trafficking."  Yet, Motel 6 and G6 entities, including Motel 6 Defendants and G6 Defendants, continued to participate in sex trafficking and allow it to occur at their properties thereafter.

v.  Four other civil lawsuits have been filed against Motel 6 Defendants and/or G6 Defendants in the past year related to sex trafficking occurring in the Seattle area, and three lawsuits implicate some or all of the same Motel 6 locations where Plaintiff was trafficked.

109.    This sampling of news stories, reviews, and other public information establishes that, at the time Plaintiff was trafficked at the subject properties, G6

Defendants and Motel 6 Defendants knew or should have known at all relevant times that:

    a. There was widespread and ongoing sex trafficking occurring at the G6 branded properties, including at the subject Motel 6s where Plaintiff was being trafficked;

    b. Sex trafficking was a brand-wide problem for G6 Defendants;

    c. G6 franchisees and hotel staff, including Motel 6 Defendants and their employees, were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking and harboring traffickers and victims at the branded hotel properties; and

    d. G6 Defendants and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

110. G6 Defendants and Motel 6 Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Motel 6 locations from 2017 to 2019.

111. Internet reviews for the subject Motel 6 locations named herein, which G6 Defendants and Motel 6 Defendants read, managed, controlled, and monitored, show the pervasiveness of crime including sex trafficking before, during and after Plaintiff was trafficked. Here are just a few examples:

- Motel 6 located at 20651 Military Rd S., Seattle, WA 98188
    - 2017 Trip Advisor review "Very sketchy people outside hanging out in the parking lot late at night. Drug dealing?? First time here in

Seattle and not a good choice for a hotel. Girl at the desk not too friendly."[31]

- o 2018 Yelp review "Every kind of criminal you ever heard of lodges here. Heroin and meth are sold from certain rooms or in the parking lot. There are always hookers around…"[32]

- o In 2021, a Google reviewer stated, "the staff and guests all look like functioning drug addicts."

- o In 2020, a Google reviewer stated, "the towel in the shower had dried blood on it" and there were "vagrants all over the parking lot, talking about addiction and "beating people."

- o In 2018, a Google reviewer stated, "there were extremely sketchy looking people hanging around the motel," and after switching rooms, "more drugged out looking people hanging around."

- o In 2019, a Google reviewer said, "there were sketchy people out there," "random people hanging around," and "Didn't feel safe."

- o In 2019, a Google reviewer said it was "a melting pot of drug addicts, thief's and criminals" and "random people knocking at my door."

- o In 2018, a Google reviewer stated, "creepy people hanging outside of rooms and . . . trying to get girls in there rooms."

- o In 2019, a Google reviewer said people were screaming and yelling all night long.

- o In 2019, another Google reviewer said, "someone tried getting in our room at 4 am then a woman was pounding on our door at 5," and "people screaming all night."

---

[31] MOTEL 6 SEATTLE SOUTH - Prices & Reviews (SeaTac, WA) (tripadvisor.com)
[32] https://www.yelp.com/biz/motel-6-seattle-south-seatac?start=10&rr=1

o   In 2018, a Google reviewer said "after dark, it got very sketchy...
    and I grew up in a sketchy neighbordhood..this was so much worse!!
    There were people fightin gin the room next to us, above us and
    outside our door…..all night long! I barely slept and was scared for
    our safety."  They also said, "Multiple calls to the front but no one
    ever answered."

o   A 2020 review said, "other hotel guests fighting during the night."

o   Another 2020 review said at check in there were police there due to
    a fight and they saw police two more times during a short stay.

o   In 2019, a Google reviewer said, "there are a lot of shady things
    that go on at that property." "There were a lot of people staying
    there that had cars coming in and they came out and did something
    and leave."

o   In 2017, a Google reviewer complained that they put her and her
    kids in a room surrounded by a biker gang that was yelling in and
    out of rooms all night.

o   In 2018, a Google reviewer said, "very shady people" and "drug
    infested hotel."

o   In 2018, a Google reviewer called it "a drug and prostitute infested
    motel."

o   In 2018, another Google reviewer said, "drug dealings and
    prostitution were daily."

o   In 2018, another Google reviewer warned about "people fighting
    outside my door."

o   In 2018, a Google reviewer told a story about a "hotel guest goes
    bezerk in a room two doors down  . . . threatens death to his

girlfriend or wife . . . breaks main window of room with something."
"Nobody cleaned up."

- o In 2020, a Google reviewer talked about how the employees were friendly with loud guests, swore at the reviewers when they complained about safety issues and people banging on their door, and they overhead the employees telling another guest down the hall that they "had a snitch" referring to the reviewer that complained.

- o In 2019, a Google reviewer stated, "drug activity happening with numerous people . . . smoking drugs and possible illegal activities going on with about 8 people in each room and about 20 people congregated in the parking lot" and "security just walked right past all that like nothing."

- o In 2019, another Google reviewer recounted "people were up all night slamming doors going in and out all through the all early hours."

- o In 2020, a Google reviewer stated, "multiple gang members calling to my room I can't sleep because people are fighting."

- o In 2018, a nearby worker gave a Google review stating "I work in the area, there are so many better and safer options. Lots of less than desirable types frequent this location."

- o In 2018, a Google reviewer stated "Lots of shady people around especially at night bad area to stay in."

- o In 2020, a Google reviewer stated, "THERE IS NO SECURITY."

- o In 2019, a Google reviewer stated, "Drug addicts everywhere."

- Motel 6 located at 16500 Pacific Highway, Seattle, WA 98188

- o In 2018, a Yelp reviewer said, "Just RUN!" and "what happens is a lot of travelers will stay for a night while the drug addicts and hookers live here." The front desk told her the police were "a daily thing" and the reviewer said regarding the crime that "the staff really really didn't seem to care, and the crime and drug use was just a normal day."

- o 2013 Yelp review "…AVOID THIS PLACE unless you are a crackhead, meth freak, prostitute or are looking to be violated in some way. I honestly can't believe this passes for a motel, as the majority of the people wandering the halls during my stay were DEFINITELY there for reasons other than just needing a place to stay."[33]

- o A 2015 Yelp review states "I'm pretty sure this motel is a staging area for prostitution. Seems like some gals were staying here with their pimps."

- o 2018 Trip Advisor review states: "I'm a recent retired LTC from the US ARMY (AOC J.A.G.) and cancer patient, who stayed at this Motel 6 for a total of 10 weeks ... Racism, preferential treatment, fraud, drug/prostitution activity, and lack of integrity all seem to be issues caused by/exacerbated by these employees. . . I'd look elsewhere if the choice is yours, if not ... sleep with one eye open!

- o 2015 Yelp review 8 states: "I'm pretty sure that this motel is a staging area for prostitution. Seems like some gals were staying here with their pimps. The area is notorious for prostitution. That

---

[33] https://www.yelp.com/biz/motel-6-seattle-seattle

said, the rooms looked new and we're clean. The staff was friendly. It's good for a night if you have an early flight out of Seatac."[34]

- o 2015 Yelp review states: "There's a whole bunch of people in and out of this motel, walking around, driving around mind you these people aren't even staying at the hotel, they'll look at you weird and make you feel super uncomfortable."[35]

- o 2013 Yelp review states: "here were prostitutes swarming around, one of which knocked on our door while we were packing. My husband said, "who is it?" and the cracking voice on the other side of the door said, 'Summer.'"[36]

- o In 2019, a Google reviewer stated, "they are using this motel to prostitute and sell drugs."

- o In 2016, a Yelp reviewer stated, "This place is littered with shady drug deals and prostitutes."

- o In 2016, another Yelp reviewer said they saw a police officer patrolling the parking lot and they asked him if it was a safe place to stay, the reviewer claims the police said, "get out of here as soon as possible" and that it was not safe for them to be there.  The police waited with them while they found another place to stay.

- o In 2020, a Yelp reviewer stated, "I wouldn't do it again unless I needed some drugs or a hooker . . . lots of foot traffic all night and a young lady asked to join me in my room for $100."

- Motel 6 located at 18900 47th Avenue, SeaTac, WA 98188

---

[34] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=30

[35] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=70

[36] https://www.yelp.com/biz/motel-6-seattle-airport-seattle?start=40

o 2017 Trip Advisor review states "Our room was very noisy most of the night and the beds were very uncomfortable. Drug dealers and prostitutes were staying at the hotel. By this time it was dark and I did not feel safe going outside so I locked the door and stayed for the night and hoped for the best. It felt very unsafe. DO NOT STAY AT THIS HOTEL. Next morning I was just grateful to be alive and that my car had not been broken into or stolen."[37]

o 2016 Trip Advisor review states "The motel is overpriced for what you get, and while I was there a few days I saw shady characters all around, a guy sleeping in his car in the parking lot, a prostitute enter the motel for her "work," druggies, and some yelling in the hallways."[38]

o 2016 Trip Advisor review states "Checked into the room with strange people lurking around. I thought with best hopes that maybe they were secretly filming a zombie movie. But then I realized it was just people most likely high on heroin bumping into the walls cuz they couldn't find their rooms. The prostitutes outside my window yelling at me their prices. . ."[39]

o 2015 Yelp review states "…and like other reviews mentioned… we did see some prostitutes in the parking lot... DEFINITELY STAY AWAY!"[40]

---

[37] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[38] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or50-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[39] https://www.tripadvisor.com/Hotel_Review-g58732-d243759-Reviews-or60-Motel_6_Seattle_WA_Sea_Tac_Airport_South-SeaTac_Washington.html
[40] https://www.yelp.com/biz/motel-6-seattle-seattle?start=70

- o 2015 Yelp review states "We had the joy of having to listen to a prostitute bang everyone, after she was finished with her sexual marathon one of the men was drunk and returned to her room demanding money, a woman in a neighboring room stepped out and told them to shut up or she'd call the police, a brawl broke out and they were all arrested."[41]

- o In 2016, a Google review mentioned staff said "she's gonna fight someone in the parking lot afterwards;" "outside doors didn't' lock;" and "Not safe."

- o 2019 Yelp review states "I checked in at 12 so most of the drugs and prostitution was minimal. No one bothered me. Went into my room, locked the door, brushed my teeth and went to bed out cold."[42]

- o 2022 Yelp review states "The whole experience was a NIGHTMARE! From what I witnessed... think this location is one that is frequented by prostitutes & the homeless."[43]

- o Google reviews from 2022 to 2025 complained that the doors to the outside around the motel were all broken so that anyone could come in at any time.

- o A Google Review form about 2019 states: "knife marks and blood spatter on the walls, from what appears to have been a knife fight/murder crime scene;" "I'm pretty sure the guys lingering outside when I was checking in (around 11 pm) were part of a trafficking ring, they followed casually behind me to my car until they realized my husband was in the car;" "the door entering to the

---

[41] https://www.yelp.com/biz/motel-6-seattle-seattle?start=30

[42] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10

[43] https://www.yelp.com/biz/motel-6-seattle-seattle?start=10

hallway of the motel was broken;" and "security needs to be fixed here."

- o In 2018, a Google review noted that a man was found dead or murdered in one of the rooms and she witnessed a housekeeper find him dead on the bed.  Hours later, they had rented it to a new person without any special cleaning crew.

- o In 2018, a Google review stated that "safety and drugs in this hotel is an issue."

- o In 2019, a Google review stated "non-working phone," "gangster graffiti on the furniture," and "neighborhood did not feel safe."

- o In 2017, a Google review stated, "people just hang around the hotel and you can tell some people live out of it;" and "we arrived about 45 minutes shy of a shooting where someone was murdered and an innocent bystander was left wounded."

- o In 2020, a Google review stated that employees told them the phones in the rooms do not work.

- o In 2020, a Google review said, "When we arrived the room looked half cleaned, with used condoms in the trash and on the floor."

- o From 2016 to 2020, online reviews mention being able to hear everything from other rooms and people up all night.

112.    G6 Defendants and Motel 6 Defendants knew Plaintiff was being trafficked at the locations named herein by the many red flags present during her regular continued stays. Plaintiff's traffickers paid for stays in cash, oftentimes were not required to present ID, paid for extended stays on a day-to-day basis, requested rooms away from other guest and/or the front desk, obvious signs of illegal drug use, obvious visible signs of physical abuse, men waiting out of the room while other men were inside with Plaintiff for short periods of time, money

exchanges throughout the property, solicitation around the property, broken doors and people coming and going constantly whom were not hotel guests.

113.    G6 Defendants are vicariously liable for the acts, omissions, and knowledge of the Motel 6 Defendants and staff of the Motel 6 Defendant locations named herein, which are G6 Defendants' actual agents or subagents.

114.    Upon information and belief, it is a standard practice in the hospitality industry, followed by all Defendants herein, for parent and brand companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the types of payments accepted, how crime is prevented or dealt with if at all, and to when, where, and how guests are greeted.

115.    G6 Defendants provide their Motel 6 Defendants and other franchisees with signage on, throughout and in front of the building. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the G6 and Motel 6 brand. This brand logo is displayed on everything in the hotel, such as on materials on the bedside table and staff uniforms worn at the front desk during check in.  This was the case for the subject three Motel 6 locations during the trafficking of Plaintiff.

116.    G6 Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems, 800 numbers, reporting numbers, online review systems, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by G6 Defendants.[44]

---

[44] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

117.     G6 Defendants subject franchisees and Motel 6 Defendants to detailed standards and requirements regarding the operation of the subject Motel 6 locations named herein through the franchising agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting requirements, and expectations imposed by the G6 Defendants. These mandates are drafted and within G6 Defendant's power and control to require and mandate in order to do business with whomever they choose.  This was also the case from 2017 to 2019, and before and after.

118.     Upon information and belief, G6 Defendants require their branded properties to use a property management system and did so at all relevant times. This system is linked to the G6 Defendants' corporate network and data center. This is to, among other things, receive reservations, manage clientele information, manage stay information, and process payment transactions.

119.     Upon information and belief, per the relevant franchise agreements, G6 Defendants, at all relevant times and currently, may enforce their brand standards through periodic and regular inspections of the hotel locations, backed up with the ultimate threat of termination of the agreement.[45]

**Motel 6 Defendants and Staff Acted as Actual Agents of G6 Defendants**

120.     G6 Defendants are vicariously liable for the acts, omissions, and knowledge of their Motel 6 Location Defendants and staff of the locations named herein, which are G6 Defendants' actual agents or subagents.

121.     G6 Defendants subjected Motel 6 Defendants to detailed standards and requirements regarding the operation of the Motel 6 locations named herein through the franchising agreements, through detailed written policies and manuals,

_____

[45] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

and through other formal and informal protocols, directives, mandates, reporting, demands and expectations imposed by the G6 Defendants.

122.    G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Defendants imposed on the franchisees:

a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Motel 6 Defendants used at their Motel 6 locations;

b.  Covered virtually all aspects of hotel operations, including internal operating functions and day to day operations;

c.  Dictated the specific manner in which Motel 6 Defendants and hotel staff must carry out most day-to-day functions at their Motel 6 locations; and

d.  Significantly exceeded what was necessary for G6 Defendants to protect its registered trademarks.

123.    In addition to the ways described above, upon information and belief, G6 Defendants exercised and reserved the right to exercise systemic and pervasive control over Motel 6 Defendants' day-to-day operation of the subject Motel 6 locations named herein, including the following ways:

a. G6 Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. They retained control to mandate the trainings and they either completed the trainings and mandated completion or they knowingly and willingly chose not to enforce the mandate despite actual knowledge of sex trafficking at

these three specific Motel 6 locations before and during Plaintiff's trafficking. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Defendants to protect their registered trademarks;

b. G6 Defendants provided training for hotel management and select hotel staff on-site at the Motel 6 locations selected by G6 Defendants;

c. G6 Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. G6 Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. G6 Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Motel 6 locations named herein, G6 Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. G6 Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Motel 6 locations named herein. Motel 6 Defendants were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to

perform internal operating functions at the hotel, including related to security;

h. G6 Defendants set required staffing levels for the Motel 6 locations named herein;

i. G6 Defendants established detailed job descriptions for all positions in its Motel 6 properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. G6 Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and decisions;

k. G6 Defendants provided benefits for employees of franchised hotels;

l. G6 Defendants required Motel 6 Location Defendants to use a customer resource management program maintained and operated by the G6 Defendants;

m. G6 Defendants controlled channels for guests to report complaints or provide feedback regarding the Motel 6 locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. G6 Defendants retained the right to provide refunds or other compensation to guests and to require Motel 6 Location Defendants to pay associated costs;

n. G6 Defendants generated reports and analysis of guest complaints and online reviews for the subject Motel 6 locations;

o. G6 Defendants required Motel 6 Defendnts to use a Guest Relations Application owned, operated, and maintained by G6 Defendants to manage all guest data and information. G6

Defendants could use the backend of this system to analyze data and generate reports;

p. G6 Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if G6 Defendants determine that the franchisees have not purchased adequate insurance;

q. G6 Defendants regularly audited and had access to the books and records of Motel 6 Defendants;

r. G6 Defendants conducted frequent and unscheduled inspections of Motel 6 properties, including the Motel 6 locations named herein;

s. G6 Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the G6 Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Motel 6 locations named herein and the prevention or response to any crimes including sex trafficking;

t. G6 Defendants controlled all marketing for subject Motel 6 locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the G6 Defendants;

u. G6 Defendants imposed detailed recordkeeping and reporting requirements on Motel 6 Defendants regarding virtually all aspects of hotel operations;

v. G6 Defendants supervised and controlled day-to-day operations of the Motel 6 locations named herein through detailed information

and extensive reports that it obtained through the property management system and other software systems it required Motel 6 Defendants to use; and

w. G6 Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**Motel 6 Defendants and G6 Defendants Knowingly Benefited from Participation in a Venture to Traffic Plaintiff for Sex with Each Other and Plaintiff's Traffickers.**

124.    Motel 6 Defendants and G6 Defendants are inextricably intertwined.

125.    Upon information and belief, at all times of trafficking alleged herein and currently, the Motel 6 location owners and franchisees typically pay a percentage of their total revenue back to the parent companies, G6 Defendants and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreements.

126.    Upon information and belief, per the franchise agreements, G6 Defendants, could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate or dangerous. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility. Public policy requires full responsibility and accountability under these circumstances.

127.    At all times of trafficking alleged herein, G6 Defendants dictated policies related to safety, security, human trafficking, employee training and the Motel 6 Defendants' responses to human trafficking and sex trafficking.

128. Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Motel 6 locations passed through a system operated and managed by G6 Defendants.

129. G6 Defendants profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking, and specifically sex trafficking, was occurring at the subject Motel 6 locations before and at that time Plaintiff was being trafficked, and specifically that she was being trafficked.

130. G6 Defendants and Motel 6 Defendants benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand through room rentals and merchandise purchases.

131. G6 Defendants and Motel 6 Defendants profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged, beat, hit, raped and maintained for the purpose of sex trafficking.

132. Motel 6 Defendants and G6 Defendants facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings. This is because in order for trafficking to operate and be a successful business—the selling of women and children for sex—it must occur regularly and consistently at a place. Here, the regular and consistent business of trafficking fed the subject Motel 6 Defendants' and G6 Defendants' business and profits.

133. Motel 6 Defendants and G6 Defendants owned and operated the subject Motel 6 properties while trafficking sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed, and heard and

should have heard, the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for weeks at a time, for years, at the subject Motel 6 properties but ignored it and/or participated it in directly so they could profit.

134.    Plaintiff's trafficking at the subject Motel 6 properties was a result of G6 Defendants and the Motel 6 Defendants participating in a venture with each other and Plaintiff's criminal individual traffickers. If G6 Defendants and Motel 6 Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location and they could have prevented serious and permanent injuries to Plaintiff and several other victims.

135.    Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Motel 6 locations, G6 Defendants and Motel 6 Defendants participated in the venture by continuing to associate with the hotels' staff and with each other to operate the hotel locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

136.    G6 Defendants and Motel 6 Defendants financially benefited from renting hotel rooms to Plaintiff and/or her traffickers for the purpose of trafficking Plaintiff on numerous occasions.

137.    G6 Defendants and Motel 6 Defendants participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Motel 6 locations.

**Hawthorn Suites Defendants and Wyndham Hotel & Resorts, Inc. Knew About and Participated in the Trafficking of Plaintiff and Others at the Hawthorn Suites by Wyndham.**

138.    HSK212, LLC and Lala Salama Hospitality, Inc. (Hawthorn Suites Defendants), as well as Wyndham Hotel & Resorts, Inc., have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and the subject Hawthorn Suites located at 6329 S. 212th Street, Kent, Washington 98032.

139.    The subject Hawthorn Suites was known as a sex trafficking hub for years before Plaintiff was trafficked there.  The subject Hawthorn Suites is near the Seattle-Tacoma International Airport and not far from the three subject Motel 6 locations where Plaintiff was also trafficked, and it is in an area that is known for sex trafficking.

140.    Hawthorn Suites Owners and Wyndham knew the area of the subject Hawthorn Suites was known for prostitution and sex trafficking and knowingly chose to enter into a franchise agreement to participate in and benefit from the sex trafficking in that area.  Wyndham flagged the property and decided to franchise it to bring it under its company umbrella several years before Plaintiff was trafficked. Hawthorn Suites had been operating since 1990.  The Hawthorn Suites Owners and the subject Hawthorn Suites were operated, managed, supervised, flagged, branded, advertised and controlled by Wyndham Hotel & Resorts, Inc. for years before and while Plaintiff was trafficked there and they all knew that prostitution, sex trafficking, sex crimes and other criminal activities were occurring there regularly for years before and during the time Plaintiff was trafficked there.

141.    Before and at all relevant times, the Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. knew that Hawthorn Suites properties, including the subject Hawthorn Suites, were used for sex trafficking.

142.    Wyndham claims it is "the world's largest and most diverse hotel company, encompassing more than 8,400 hotels across 24 brands in 95 countries." It boasts about its twenty five (25) brands—all of which it created, controlled, and sells to the public by and through its franchisees under a false guise of security and safety.

143.    Wyndham owns several brands, including Hawthorn Suites by Wyndham®, and controls, markets, brands, and holds itself out as the owner and controller of, each.  It has numerous hotels in the State of Washington currently that it profits from.  It has a rewards program and credit card with points through which it sends people to its branded properties, including Hawthorn Suites and at all times relevant, the subject Hawthorn Suites.  It allows the public, including traffickers, to book rooms at its branded properties through its website and provides offers and deals online for its properties, including the subject Hawthorn Suites at all times relevant.

144.    Wyndham and Hawthorn Suites Owners defendants were at all times relevant, a single and joint employer for the periods of time that each Hawthorn Suites Owner owned the subject hotel, with a high degree of interrelated, intermingled, and unified operations at the Hawthorn Suites property where Plaintiff Jane Doe was trafficked for sex. Wyndham and Hawthorn Suites Owners each share the common policies and practices complained of herein.

145.    The Wyndham Hotel & Resorts, Inc. owns, operates and controls one of the largest budget hotel chains in the United States.  More recently, it has franchised more and more properties in attempt to avoid liability but it has not given up the control or power over the properties, including at all relevant times, the subject Hawthorn Suites. It knew and knows details about each property and was and is involved in the day-to-day operations at each property, including the

crime that takes place at each and including the subject Hawthorn Suites from 2016 to 2020, and before and after.

146. At all relevant times, Wyndam is and has been concerned with profit and not people or people's safety. Upon information and belief, at all times of trafficking alleged herein, the Hawthorn Suites Owner Defendants paid Wyndham a significant percent of their total revenue and were required to operate and maintain the property in accordance with the parent Wyndham's brand standards as they are laid out in the franchise agreement and other implied and explicit agreements.

147. Based upon information and belief, the Wyndham Hotel & Resorts, Inc. franchised the subject Hawthorn Suites to the Hawthorn Suites Owners before and/or during the time Plaintiff was trafficked, abused, and raped there knowing that the property was already a cesspool for crime and criminal activity, including prostitution and sex trafficking. Wyndham Hotel & Resorts, Inc. conducts detailed inspections of property and areas before entering into franchise agreements, and during the period of agreements, and did the same here. At all relevant times, the subject high-crime area and property would have been readily apparent upon reasonable inspection.

148. Upon information and belief, Wyndham Hotel & Resorts, Inc. conducts research and chooses what locations to enter into franchise agreements with and knew before agreeing to franchise and operate the subject Hawthorn Suites that it was in a location and on property that was known for sex trafficking, sex crimes and other criminal activity.

149. Wyndham Hotel & Resorts, Inc. holds itself out to the public as the operator of the Hawthorn Suites and now, Hawthorn Extended Stays that it franchises, including the subject Hawthorn Suites, and has made public statements about it being the operator of its franchised properties. At all relevant times, it

advertised each property and provided details and misrepresentations about safety to the public in attempt to entice the public to rent rooms at the properties, including the subject property.

150.    Based upon information and belief, at all relevant times, the Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. had a written agreement that gave it control over the subject Hawthorn Suites and Hawthorn Suites Owners as it relates to booking and payment policies, safety and reports related to safety concerns, crime at the property, and to inspect the property and to make any changes necessary for the safety of guests at the property.

151.    Based upon information and belief, the subject Hawthorn Suites employees and Hawthorn Suites Owners reported to the Wyndham Hotel & Resorts, Inc. about any and all criminal activity, including from 2017 through 2019, and it was known to the Wyndham Hotel & Resorts, Inc. that criminal activity was ramped at the subject Hawthorn Suites, that commercial sex was taking place daily and nightly and that people were forcing women and girls to engage in commercial sex by use of physical force, threats and coercion at the subject Hawthorn Suites during that time.

152.    From 2017 through 2019, as well as before and after, Hawthorn Suites Owners, per the respective times they owned the property, spoke to police officers regularly who responded to calls from guests and the public related to crime, including rape, prostitution, domestic violence, assault and battery, death and other crimes arising out of sex trafficking, including sex trafficking itself.  Hawthorn Suites Owners were directly made aware of the crimes related to sex trafficking from law enforcement, traffickers, employees, agents, and other guests and victims.

153.    Based upon information and belief, Wyndham Hotel & Resorts, Inc. was made aware of the police activity, response to sex crimes including sex

trafficking, and police reports from Hawthorn Suites Owners and by and through their own audits, investigations and inspections of the subject Hawthorn Suites.

154.    Wyndham also has put out several public statements over the past ten (10) to fifteen (15) years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming that they will be committed to fight against it.

155.    Defendant Wyndham signed "the Code" several years ago before Plaintiff was trafficked and thereby promised to adopt policies to combat trafficking.[46] Yet, Defendants have failed to implement most, if not all, of those policies.

156.    Defendant Wyndham is a face and signor of the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking—this was before Plaintiff's trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective mandatory Brand standards to be mandated at its branded properties, but it should also have enforced them.  Despite Wyndham's direct and vicarious knowledge of trafficking at its hotel, it did not create, implement or enforce effective standards to prevent the trafficking it knew its properties were facilitating, including at the subject Hawthorn Suites.

157.    Based upon information and belief, Wyndham Hotel & Resorts, Inc. conducted regular inspections of the subject Hawthorn Suites during the time Plaintiff was trafficked there and directly witnessed sex trafficking red flags, including solicitation, women being forced to stand around the motel and solicit sex, traffickers standing around the motel with weapons watching, money exchanges,

---

[46] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

men going in and out of rooms that were not guests, bruised and battered women, women and minor girls dressed in provocative clothing being ushered around by traffickers, drug activity, and other crime.

158. Based upon information and belief, the Wyndham Hotel & Resorts, Inc. has an ownership interest in and/or owns several other Hawthorn Suites and/or Harthorn Extended Stays and other branded hotels that have participated in sex trafficking ventures and where VICE units and other police departments have made several arrests and found adult and minor victims being trafficked for sex.

159. Several federal lawsuits have been filed against Wyndham Hotel & Resorts, Inc. and hundreds of sex trafficking victims have come forward against Wyndham Hotel & Resorts, Inc. describing similar stories about how they were blatantly and openly trafficked for sex and abused and harbored at Wyndham properties.

160. From 2017 through 2019, Wyndham Hotel & Resorts, Inc. had access to and did review, intercept, and read online reviews for its properties that it owns and/or operates as franchisors, including the subject Hawthorn Suites. Reviews from most of the Hawthorn Suites locations that Wyndham Hotel & Resorts, Inc. had a franchise and ownership interest in put the Wyndham Hotel & Resorts, Inc. on direct notice that prostitution and sex trafficking had been occurring at many of its locations for over a decade.

161. Internet reviews for the subject Hawthorn Suites location named herein, which Wyndham and Hawthorn Suites Defendants reviewed, read, managed, controlled, and monitored show the pervasiveness of drugs and activity consistent with trafficking before and during the time Plaintiff was trafficked. Here are just a few examples:

- 2019 Tripadvisor review states "As a business traveler for 35 years I have tons of real world experience staying at all brands and luxury levels of hotels. In over 3000 hotel stays, this property rates in the bottom worst 5

for me. Filth, unkempt, no maintenance, missing and broken items, etc. Police on property regularly with drug problems, prostitution, and even gunshots!"

- 2019 Tripadvisor review states "…Drug deal, prostitution, high school party, and a friend's car was broken into all on a Saturday night. I am just seriously amazed at how bad it was."

- 2018 Google review sates "…we were leaving around 4am to get out flight and easily a dozen people were still up and outside doing 'nothing'- looking drunk-high-unkempt and up to no good."

- 2018 Google review states "This place is scary. Used to stay here 15 years ago when the place was nice stayed recently and if you want hookers and drugs this is the place to stay. I was propositioned a few times…"

162.    Prostitution is commercial sex.  Forced commercial sex via force, coercion, or fraud, is sex trafficking.  Signs of commercial sex are signs of sex trafficking.  Combined with all other obvious signs that showed force, coercion and fraud—Defendants had actual knowledge of sex trafficking occurring at their properties.

163.    Wyndham has published reports indicating that it controls and implements anti-trafficking policies at its branded hotels and its website directs consumers to information regarding the same.

164.    Despite reports, police activity and investigation of trafficking at the subject Hawthorn Suites, and direct knowledge of trafficking at the subject Hawthorn Suites, Wyndham did not change its ways or policies and procedures no matter how many people it hurt through the years.

165.    Wyndam claims in a recent public report that it "continues to work to enhance policies and mandate training for all team members to help them identify and report suspected trafficking activities."  Thus, it knows sex trafficking is a

problem at its properties and its other public statements show it knows, and at all relevant times knew, trafficking has been an ongoing problem for years.

166.    Based upon information and belief, Wyndham Hotel & Resorts, Inc. obtained all reviews for the branded properties it operated, including the subject Hawthorn Suites and analyzed the reviews as part of a data report and ongoing operations.  Wyndham retained control over the subject Hawthorn Suites' response to reviews and reports of criminal activity, including sex trafficking.

167.    Ultimately, at least several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Motel 6 and Wyndham branded properties owned and/or controlled by Motel 6 parent companies and/or Wyndham.

168.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. were and are well aware of the sex trafficking signs and red flags, as well as the fact that it had occurred at hotels and motels for decades and despite that knowledge back when Plaintiff was being trafficked, it chose to allow it to happen at its properties, including the subject Hawthorn Suites from 2017 through 2019, because it was profiting from the criminal activity.

169.    In 2011, a Change.org petition was published to address rampant gang-based sex trafficking in Wyndham hotels in California.  The petition argued that from 2006 to 2011, members of the Crips gang in San Diego ran child sex trafficking rings of at least sixteen (16) girls out of various area hotels. Two subject properties on which many instances of child sex trafficking took place were a Howard Johnson in Escondido, California, and a Travelodge in San Diego, California, both owned and controlled by the Wyndham group, Wyndham Hotel & Resorts, Inc.

170. Hawthorn Suites Owners saw and heard sex trafficking occurring at the subject Hawthorn Suites from 2017 through 2019 while each owned it, including the trafficking of Plaintiff there. Hawthorn Suites Owners communicated with Plaintiff's traffickers and Wyndham Hotel & Resorts, Inc. about the trafficking of victims, including Plaintiff, during that time. They sometimes referred to the victims as "hoes," "sex workers," and "prostitutes," and the traffickers as "pimps." Hawthorn Suites Owners and their employees knew the traffickers and knew that the traffickers controlled Plaintiff, and it was clear that Plaintiff's traffickers were watching and/or controlling Plaintiff at all times and forcing her to engage in commercial sex. Hawthorn Suites Owners understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Hawthorn Suites and to the traffickers for profits, including Hawthorn Suites Owners' and Wyndham Hotel & Resorts, Inc.'s profits. Defendants Hawthorn Suites Owners and Wyndham, by and through their employees and agents, had specific arrangements with Plaintiff's traffickers for the trafficking of Plaintiff.

171. Wyndham Hotel & Resorts, Inc. inspected the property from 2017 through 2019 on multiple occasions and saw the red flags of Plaintiff's and other victims' trafficking and knew or should have known that it was profiting and benefiting from the room rentals that directly resulted from the trafficking of Plaintiff and other sex trafficking victims at the subject Hawthorn Suites—a venture that it was directly participating in.

172. Upon information and belief, before and at the time Plaintiff was trafficked at the subject Hawthorn Suites, Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. saw victims, including but not limited to Plaintiff, being held captive, controlled, coerced, threatened, sold, drugged, abused, hit, beat, injured, deprived of basic needs, and trafficked for sex there. Hawthorn Suites Owners,

Wyndham Hotel & Resorts, Inc., and/or their employees and agents while working in the course and scope of their employment and agency with each, directly witnessed all signs of sex trafficking, including the signs of the trafficking of Plaintiff described above.

173.   The police responded to 911 calls from outsiders and guests at the subject Hawthorn Suites property regularly 2017 through 2019 for criminal activity, including crimes related to sex trafficking.

174.   Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. were made aware of those crimes and sex crime incidents in which law enforcement responded at the property during the subject times that Plaintiff was regularly trafficked there for sex, by and through law enforcement and the public, and did not do anything to try to prevent the sex crimes, including sex trafficking, from continuing to occur at the property from 2017 through 2019.

175.   Since at least the early 1990s, Wyndham Hotel & Resorts, Inc. knew or should have known employees and staff at its properties, including the subject Hawthorn Suites, were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs;" not requiring parking passes; not having gated parking lots; allowing daily payments of cash for extended stays; complying with requests for specific rooms; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms without IDs where victims were trafficked; allowing guests to use illicit drugs on property; allowing violence to occur at the property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the

trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking; and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property. Hawthorn Suites Owners knew or should have known the same for the periods of time that they owned the property, including but not limited to while Plaintiff was being trafficked there.

176.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. have direct access to, read and respond to reviews left by guests on websites wherein guests frequently complain about the prevalence of sketchy people, prostitution, hookers, drugs, crime and other signs of trafficking at the subject Hawthorn Suites. Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. read online reviews, so they saw the reviews that put them on notice or should have put them on notice of trafficking occurring at the subject Hawthorn Suites, including from 2017 through 2019.

177.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. provided the means necessary for traffickers to traffic victims, including Plaintiff.

178.    At all relevant times, Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. arranged with traffickers to have victims housed in specific areas and rooms to make it easier for traffickers to conduct their business.

179.    At all relevant times, Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. allowed traffickers to use other people's identification or did not require any form of identification, knowing illegal activity that would occur, and understanding that sometimes payment would not be made until after the forced commercial sex acts.

180.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. sometimes charged higher room rates to traffickers in exchange for permitting

trafficking activities to be conducted at the subject Hawthorn Suites and accommodating late, cash payments.

181. Hawthorn Suites Owners' employees often participated and engaged in trafficking activities at the subject Hawthorn Suites. Plaintiff observed that the employees seem to have agreements with the traffickers to facilitate the trafficking business and not to report them so long as they paid.

182. Wyndham Hotel & Resorts, Inc. knew or should have known about the Hawthorn Suites Owners' employees and agents' participation and engagement in trafficking activities at the subject Hawthorn Suites because it was readily apparent upon any reasonable inspection from at least 2013 to 2019.

183. The subject Hawthorn Suites had malnourished, underage and adult women under the control of traffickers who openly conducted their trafficking business in front of Hawthorn Suites employees and/or management and the traffickers rented numerous hotel rooms for the buyers to come and go night after night. From 2017 to 2019, Wyndham Hotel & Resorts, Inc. and Hawthorn Suites Owners would have easily seen this regular, open activity upon any reasonable inspection of the property and did see it.

184. Based upon information and belief, the subject Hawthorn Suites has had other sex trafficking survivors speak out against it related to its owners, operators and franchisors allowing and participating in the open and blatant sex trafficking that took place at the subject Hawthorn Suites.

185. During the period Plaintiff was trafficked at the subject Hawthorn Suites, obvious signs existed and were visible to anyone paying attention that her traffickers were engaged in sex trafficking.

186. Other women and girls were trafficked by other traffickers at the same Hawthorn Suites at the same time as Plaintiff and Hawthorn Suites Owners and

Wyndham Hotel & Resorts, Inc. saw and heard the signs and should have saw and heard the signs of that sex trafficking too.

187.    Suites Owners and Wyndham Hotel & Resorts, Inc. knew traffickers were controlling women and girls at the subject Hawthorn Suites and forcing the women and girls to have sex there but Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. only cared about getting money for rooms and chose not to intervene, report or do anything to stop the known trafficking and other crimes occurring at the property.

188.    Defendant Wyndham Hotel & Resorts, Inc.'s and Hawthorn Suites Owners' agents and employees were physically at the subject Hawthorn Suites often from 2017 to 2019 while Plaintiff was being trafficked there.  Based upon information and belief, the subject defendants' employees and agents were aware of all operations and criminal activity because they had employees that were engaged in such activity and regular guests that lived at the property for long periods of time that were also engaged in the criminal activities daily and nightly. The Hawthorn Suites defendants, by and through their employees and agents, inspected the property, conducted audits and were running major and day-to-day operations of the subject Hawthorn Suites such that they knew about the sex trafficking firsthand and by and through their employees and agents.

189.    At all relevant times, Plaintiff's traffickers would get the rooms; did not appear to have to show any form of ID to the Hawthorn Suites,  Hawthorn Suites Owners or their employees; were allowed to pay in cash and would linger around the hotel or in the parking lot throughout the nights and days while Plaintiff was forced to have sex with non-guest buyers at the subject Hawthorn Suites multiple times per day/night for several days at a time. This was all in plain sight of Hawthorn Suites Owners daily and nightly, Wyndham Hotel & Resorts, Inc.

during inspections, and to both by and through their employees and agents, as well as reports from the public and police.

190.    At the subject Hawthorn Suites, Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day that Plaintiff was trafficked there for days and weeks at a time, for years. Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. made an active choice not to call the police or notify law enforcement about the trafficking that they knew was going on at the subject Hawthorn Suites regularly for years, including the trafficking of Plaintiff, so that they would continue to profit from the sex trafficking ventures.

191.    Heavy foot traffic took place in and out of the rooms where Plaintiff and other victims were being harbored at the subject Hawthorn Suites. This foot traffic involved men who were not hotel guests and did not show identification to the hotel or require parking passes to park. Several men came in and out of the subject hotel rooms and on and off the property in a single day. These individuals entered the room Plaintiff and other victims were in and left at unusual hours and were present at the hotel or in the room for brief periods of time. Their comings and goings were visible to hotel employees and the employees of Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. that were located at the front desk and around the property.   Some employees and guests appeared to live at the Hawthorn Suites and were always around.  A reasonable hotel/motel company would have seen these regular "red flag" interactions at their property in plain sight and Hawthorn Suites Owner Defendants should have seen it themselves while at the property, as well as by and through their employees and agents who were at the property and also observed all of the signs of Plaintiff's trafficking.

192.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. allowed, facilitated, and participated in the trafficking.  Hawthorn Suites Owners and

Wyndham Hotel & Resorts, Inc. could easily see what was going on because it was happening constantly and in plain view of them and their employees and agents.

193.   Plaintiff would have been seen by Hawthorn Suites Owners' and Wyndham Hotel & Resorts, Inc.'s employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy. Other victims, including minor victims, of Plaintiff's traffickers would have been visible to the employees and agents too.

194.   There were obvious signs of Plaintiff's trafficking visible to Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, abuse, control, condoms, sex paraphernalia, lingerie, loitering, drug use and selling, and solicitation. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, inspecting the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

195.   When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees that she passed by regularly at the subject Hawthorn Suites for years. Plaintiff looked much younger than her actual age and would have appeared to any reasonable person to be a minor.

196.   Upon information and belief, multiple employees of each Defendant, including the Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc., and including management-level employees, observed, or were made aware of the obvious signs of Plaintiff's trafficking while acting within the course and scope of their employment with each applicable defendant.

197. As such, Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. knew and should have known that Plaintiff and others were being trafficked for sex at the subject Hawthorn Suites regularly from 2017 to 2019, as well as before and after.

198. At all times relevant, from 2017 to 2019, Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. knowingly profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers related to her trafficking and the trafficking of others.

**Wyndham Hotel & Resorts, Inc. Exercised Control Over the Subject Hawthorn Suites and the Hawthorn Suites Owners.**

199. Hawthorn Suites Owners owned the Hawthorn Suites located at 6329 S 212th Street, Kent, WA, 98032 during the time Plaintiff was trafficked.

200. Wyndham Hotel & Resorts, Inc. is vicariously liable for the acts, omissions, and knowledge of the Hawthorn Suites employees and staff of the subject Hawthorn Suites, including Hawthorn Suites Owners, because the employees and staff were Defendants' actual agents or subagents.

201. Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendant Wyndham Hotel & Resorts, Inc., for parent companies to set exacting brand quality standards, rules and to retain control over day to day operations, including things like the temperature at which coffee shall be served, room rates, documentation to be kept, how to handle crime, how to report crime, policies and procedures for staff to follow in response to suspected criminal activity, policies and procedures related to staff and employees engaging in criminal activity, employee and agent training, public relations and responses, and to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted and how and where guests must park.

202.    Wyndham Hotel & Resorts, Inc. Defendant provided their Hawthorn Suites locations with signage on and in front of the buildings and throughout the properties. This was done to assure customers that when they checked in, they could expect an experience consistent with the standards of the parent hotel Wyndham brand, including the public statements and promises Wyndham Hotel & Resorts, Inc. made and makes to the public about safety and comfort. This brand logo is usually displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

203.    Wyndham Hotel & Resorts, Inc. provides their hotels branded locations brand name recognition, a marketing campaign, hotel listings, advertising, and participation in online hotel databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand programs, training programs, audits, financial tools and company websites. Therefore, bookings and room reservations are primarily controlled by Wyndham Parent Hotel Defendants.[47]

204.    Wyndham Hotel & Resorts, Inc. subjects and at all relevant times subjected their hotel locations, including the subject Hawthorn Suites, to detailed standards and requirements regarding the operation of the subject Hawthorn Suites through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the Wyndham Hotel & Resorts, Inc. parent hotel defendant.

205.    Upon information and belief, at all relevant times, Wyndham Hotel & Resorts, Inc. required its branded hotel properties, including the Hawthorn Suites Owners named herein, to use a property management system that is linked to the Wyndham Hotel & Resorts, Inc.'s corporate network and data center. This is to,

---

[47] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

206.    Upon information and belief, per the relevant agreements, Wyndham Hotel & Resorts, Inc. may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject Hawthorn Suites during the subject time period, backed up with the ultimate threat of and ability to terminate the agreement and operations.[48]

**Hawthorn Suites and Hawthorn Suites Owners Employees and Staff Acted as Actual Agents of Defendant Wyndham Hotel & Resorts, Inc.**

207.    Wyndham Hotel & Resorts, Inc. is vicariously liable for the acts, omissions, and knowledge of their employees, agents and staff of the subject Hawthorn Suites location described herein, which are Wyndham Hotel & Resorts, Inc.'s actual agents or subagents.

208.    Hawthorn Suites Owners and Wyndham Hotel & Resorts, Inc. subjected Hawthorn Suites employees and agents to detailed training, standards and requirements regarding the operation of the Hawthorn Suites location named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by Wyndham Hotel & Resorts, Inc.—and the Corporation retained the right to enforce its training, policies, rules and standards. It could have here to prevent trafficking at its hotel, but chose to participate rather than eliminate it.

---

[48] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

209. Upon information and belief, the standards that Defendant Wyndham Hotel & Resorts, Inc. imposed and imposes on their branded properties at all relevant times included but were not limited to the following:

   a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Hawthorn Suites used at thus subject location;

   b. Covered virtually all aspects of hotel operations, including internal operating functions;

   c. Dictated the specific manner in which Hawthorn Suites Owners and the subject Hawthorn Suites and hotel staff carry were to carry out most day-to-day functions at the Hawthorn Suites; and

   d. Significantly exceeded what was necessary for Wyndham Hotel & Resorts, Inc. to protect its registered trademarks.

210. In addition to the ways described above, upon information and belief, Wyndham Hotel & Resorts, Inc. exercised and reserved the right to exercise systemic and pervasive control over Hawthorn Suites Owners' and the subject Hawthorn Suites' day-to-day operation of the subject Hawthorn Suites location during relevant times, including in the following ways:

   a. Defendant Wyndham Hotel & Resorts, Inc. required Hawthorn Suites Owners and management of the hotel to participate in training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham Hotel & Resorts, Inc. to protect its registered trademarks;

   b. Defendant Wyndham Hotel & Resorts, Inc. provided training for hotel management and select hotel staff on-site at the Hawthorn

Suites location and Wyndham Hotel & Resorts, Inc. went to the Hawthorn Suites location;

c. Wyndham Hotel & Resorts, Inc. required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. Wyndham Hotel & Resorts, Inc. controlled training provided by Hawthorn Suites Owners to hotel staff by dictating the content of that training, especially related to crime and/or human trafficking, providing required content for that training, and dictating the training methods used;

e. Wyndham Hotel & Resorts, Inc. retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Hawthorn Suites was required to purchase to operate the Hawthorn Suites location, or to use, Wyndham Hotel & Resorts, Inc. designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor such that it had to sign off or give permission;

g. Wyndham Hotel & Resorts, Inc. required the Hawthorn Suites Owners to sign technology, software, and data agreements governing the terms under which it must procure, store, share and use technical services, software and data related to the subject Hawthorn Suites. Hawthorn Suites Owners were required to install, and use certain brands, types, make, and/or models of hardware, software, peripheral equipment, data storage, data sharing devices and software and support services to perform internal operating functions at the subject Hawthorn Suites;

h. Wyndham Hotel & Resorts, Inc. consistently communicated with, directed, instructed, and got updates from certain staff and employees of Hawthorn Suites Owners and any management companies of the subject Hawthorn Suites;

i. Wyndham Hotel & Resorts, Inc. established detailed job descriptions for several positions in its Hawthorn Suites hotels, including the subject Hawthorn Suites, and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. Wyndham Hotel & Resorts, Inc. Defendant set requirements for the hiring process used by Hawthorn Suites Owners and property management companies, and oversaw employee discipline processes and terminations such that Wyndham Hotel & Resorts, Inc. wanted to and did retain control over employment issues between Hawthorn Suites Owners and their employees and agents that ran the day-to-day operations at the subject Hawthorn Suites;

k. Based upon information and belief, Wyndham Hotel & Resorts, Inc. provided benefits and perks for employees of Hawthorn Suites Owners and anyone that worked for the subject Hawthorn Suites;

l. Wyndham Hotel & Resorts, Inc. required Hawthorn Suites Owners to use a customer resource management program maintained and operated by the Wyndham Hotel & Resorts, Inc.;

m. Wyndham Hotel & Resorts, Inc. controlled channels for guests to report complaints or provide feedback regarding the subject Hawthorn Suites location and directly participated in the response and/or supervised the response to customer complaints or other feedback. Wyndham Hotel & Resorts, Inc. retained the right to

provide refunds or other compensation to guests and to require Hawthorn Suites Owners or other Hawthorn Suites employees to pay associated costs;

n.  Wyndham Hotel & Resorts, Inc. generated reports and analysis of guest complaints and online reviews for the subject Hawthorn Suites location;

o.  Wyndham Hotel & Resorts, Inc. required Hawthorn Suites Owners and the subject Hawthorn Suites to use a Guest Relations Application/software owned, operated, and maintained by Wyndham Hotel & Resorts, Inc. to manage all guest data and information. Wyndham Hotel & Resorts, Inc. could use the backend of this system to analyze data and generate reports;

p. Wyndham Hotel & Resorts, Inc. set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if Wyndham Hotel & Resorts, Inc. determines that the property has not purchased adequate insurance;

q. Wyndham Hotel & Resorts, Inc. regularly audited the books and records of the subject Hawthorn Suites Location and retained the right to do so;

r. Wyndham Hotel & Resorts, Inc. Defendant conducted frequent and unscheduled inspections of Hawthorn Suites properties, including the subject Hawthorn Suites location;

s. Wyndham Hotel & Resorts, Inc. retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take

other steps up to and including termination of agreements if Hawthorn Suites locations violated any of its detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject Hawthorn Suites;

t. Wyndham Hotel & Resorts, Inc. controlled all marketing for the subject Hawthorn Suites and prohibited it from maintaining any online presence unless specifically reviewed and approved by the Wyndham Hotel & Resorts, Inc., including but not limited to on all sites it was reviewed and reviewable;

u. Wyndham Hotel & Resorts, Inc. imposed detailed recordkeeping and reporting requirements on Hawthorn Suites Owners and the subject Hawthorn Suites regarding virtually all aspects of hotel operations;

v. Wyndham Hotel & Resorts, Inc. supervised and controlled day-to-day operations of the Hawthorn Suites through detailed information and extensive reports that it obtained through the property management system and other software systems it required Hawthorn Suites Owners to use;

w. Wyndham Hotel & Resorts, Inc. retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the subject Hawthorn Suites.

x. Wyndham Hotel & Resorts, Inc. required that Hawthorn Suites Owners provide certain amenities in very specific ways and monitored the day-to-day offerings, including wi-fi, housekeeping, security, on-site parking, group rates, credit cards, online bookings, payment options that must and should have been accepted, free

breakfast, "best price guarantees," and booking and data technology; and

y. Wyndham Hotel & Resorts, Inc. flagged the subject Hawthorn Suites, which means it put the property under the umbrella of its company and told the public that it was part of a recognized brand and entered into an agreement with the Hawthorn Suites Owners that mandated Wyndham Hotel & Resorts, Inc. had control over the operations and that it must operate under the brand's standards, rules and guidelines.

**Wyndham Hotel & Resorts, Inc. Knowingly Benefited from Participation in a Venture with Hawthorn Suites Owners and Plaintiff's Traffickers.**

211.    Wyndham Hotel & Resorts, Inc. and Hawthorn Suites Owners are inextricably intertwined.

212.    Upon information and belief, at all times of trafficking alleged herein and currently, the Hawthorn Suites locations typically pay a percentage of their total revenue back to the parent company, Wyndham Hotel & Resorts, Inc., and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement and through other direct and implied agreements.

213.    Upon information and belief, per the franchise agreements, Wyndham Hotel & Resorts, Inc., could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate or to engage in illegal activities. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility.

214.    At all times of trafficking alleged herein, Wyndham Hotel & Resorts, Inc. dictated policies related to safety, security, human trafficking, employee training and the subject Hawthorn Suites Location's response to human trafficking and sex trafficking.

215.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Hawthorn Suites passed through a system operated and managed by Wyndham Hotel & Resorts, Inc..

216.    Defendant Wyndham Hotel & Resorts, Inc. profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring at the subject Hawthorn Suites before and at that time, and specifically that she was being trafficked.

217.    Defendant Wyndham Hotel & Resorts, Inc. benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

218.    Defendant Wyndham Hotel & Resorts, Inc. profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged and maintained for the purpose of sex trafficking.

219.    Defendant Wyndham Hotel & Resorts, Inc. facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

220.    Hawthorn Suites Owners owned and operated the subject Hawthorn Suites while trafficking sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff and others. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their

employees and agents observed or should have observed the trafficking occurring regularly and for weeks at a time, for years, at the subject Hawthorn Suites location but ignored it so they could profit.

221.    Plaintiff's trafficking at the subject Hawthorn Suites location was a result of Wyndham Hotel & Resorts, Inc. and the Hawthorn Suites Owners participating in a venture with each other and Plaintiff's criminal traffickers. If Wyndham Hotel & Resorts, Inc. had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

222.    Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Hawthorn Suites, Defendant Wyndham Hotel & Resorts, Inc. participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

223.    Defendant Wyndham Hotel & Resorts, Inc. financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions, which were used for the purpose of sex trafficking Plaintiff.

224.    Defendant Wyndham Hotel & Resorts, Inc. participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Hawthorn Suites location.

**Defendants Facilitated the Trafficking of Plaintiff**

225.    During the times Plaintiff was trafficked at the subject properties, Defendants participated directly in most aspects of the operation of the subject

properties for which they owned, had an ownership interest in, franchised and/or controlled that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

a. Defendants assumed responsibility and control over the human trafficking response of their subject motel properties, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee education, training and response, partnership with external organizations, and advocacy;

b.      Defendants retained control over when its branded motel would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in their branded motel location;

c.      Defendants retained control over determining which motels/hotels needed additional training or other resources on the risk of trafficking occurring and other related criminal activity based on actual activities and crimes known to have occurred at each;

d.      Defendants retained control to terminate hotel staff and/or agreements based on the response to human trafficking;

e.      Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives it, and the consequences of someone not participating or failing to follow such training; and

f.      Defendants retained control over setting, supervision, overseeing, and enforcement policies and procedures for housekeeping services at the subject motel location, including how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

226. Defendants provided the means, methods and a location for traffickers, including Plaintiff's traffickers, to traffic and sell victims for commercial sex and commit sex trafficking from 2017 to 2019.

227. As a direct and proximate result of these egregious practices of Defendants, and each of them, Plaintiff and other victims of sex trafficking and exploitation have been permanently injured and damaged physically, emotionally, psychologically, and financially.

228. Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the hotel locations they owned and operated because the trafficking was the direct result of Defendants facilitating the trafficking at the subject locations.

229. Defendants are responsible for the acts, omissions, and knowledge of all employees and agents of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Defendants ratified these acts and omissions because Defendants failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to Defendants of sex trafficking occurring that the subject hotel locations; and Defendants failed to have repercussions and to terminate employment of employees and agents directly facilitating trafficking.

230. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims and Plaintiff.

231. Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with her

traffickers by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate the sexual exploitation of Plaintiff.

232. Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Plaintiff in ways including: (1) allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking; 92) inadequate and inadequately enforced sex trafficking notice and training for hotel staff; (3) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and (4) implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**Defendants are Jointly Responsible for the Trafficking of Plaintiff**

233. Parent company Defendants, including G6 Defendants and Wyndham Defendant, participated in a joint venture with each of its franchisees that owned the subject motels and hotels where Plaintiff was trafficked from 2017 to 2019, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

234. Upon information and belief, the operation of the subject Motel 6s was part of a single unified operation by G6 Defendants. Upon information and belief, the subject Motel 6 locations shared common parent companies, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants acted jointly to own, operate, control, manage, and supervise the subject Motel 6 locations and Motel 6 Defendants. As an

integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

235.    Upon information and belief, the operation of the subject Hawthorn Suites was part of a single unified operation by Wyndham Hotels and Resorts, Inc. Upon information and belief, Hawthorn Suites had a parent company, was subject to joint control, and operated as an integrated enterprise and/or as an alter-ego. Upon information and belief, Wyndham Hotels and Resorts, Inc acted to own, operate, control, manage, and supervise the subject Hawthorn Suites location. As an integrated enterprise and/or joint venture, Wyndham Hotels and Resorts, Inc and the subject Hawthorn Suites Owners Defendants were separately and jointly responsible for compliance with all applicable laws.

**Defendants are Jointly and Severally Liable for Plaintiffs' Damages**

236.    Jane Doe was trafficked and regularly subjected to heinous abuse at each of the subject hotel locations. She was regularly rotated between the above locations and tortured for several days and weeks on end at each. She was raped and sexually assaulted repeatedly by countless men that paid her traffickers money to do so. However, her traffickers were not the only ones profiting from her relentless abuse. Defendants profited every night that Jane Doe was held against her will through force, fraud, and coercion at these properties through the rooms her traffickers booked and the goods that they purchased.

237.    For years, Jane Doe was subjected to the unimaginable horrors of human sex trafficking all within rooms controlled, advertised, branded, designed, offered, supervised, inspected, owned fully or in part, and rented out by Defendants.

238.    Trapped in a cycle of exploitation and abuse, Jane Doe endured repeated sexual assaults, physical violence, psychological manipulation, and dehumanizing treatment at the hands of her traffickers and the hotels and its staff, including Defendants, that enabled her trafficking to continue within their

premises. Jane Doe's daily existence was a living nightmare, filled with constant fear, pain, and humiliation. She was treated not as a human being with dignity and self-worth, but rather as an object to be sold and violated for monetary gain. As such, Jane has suffered a catastrophic noneconomic damages from this trauma that she will have to live with for the rest of her life.

239.    Jane Doe has been robbed of the ability to ever lead a normal life.  She is now and will always be plagued by nightmares, fears, uncontrollable triggers, subconscious and conscious reactions to triggers, anxiety, lack of optimism, stress, low self-esteem, low self-worth, insecurities, embarrassment, humiliation, sadness, and lack of confidence.  She will never be the person she was before.  She is stuck with the physical, psychological, and scarring injuries for life.  She will never be able to erase what happened to her.

240.    The venture or ventures in which each Defendant participated were direct, legal, producing, and proximate causes of the injuries and damages to Plaintiff described herein.

241.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of the sexual exploitation and trafficking.

## CAUSES OF ACTION AGAINST DEFENDANTS

### Sex Trafficking Under 18 U.S.C. § 1595.

1. **Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Against All Defendants)**

242.    Plaintiff realleges and incorporates the allegations in paragraphs 1 through 241.

243. Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

244. Defendants, and each of them, are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

    a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored and maintained individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

    b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

245. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated jointly with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and all other damages described herein as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

**2. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (All Defendants).**

246. Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 245.

247. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the

"beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

248. Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. Defendants' employees had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the traffickers and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

249. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and Plaintiff's traffickers in the operations of their respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

250. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated jointly with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and all other damages alleged herein because of being trafficked and sexually exploited at the Defendants' hotel properties.

3. **Cause of Action: Vicarious Liability for TVPRA Violations (G6 Hospitality Property, LLC; G6 Hospitality, LLC; G6 Hospitality IP, LLC; G6 Hospitality Purchasing LLC; G6 Hospitality Franchising, LLC; Motel 6 Operating, L.P.; Wyndham Hotel & Resorts, Inc., and DOES 1 through 100).**

251. Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 250.

252. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

253. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

254. Motel 6 Defendants—SeaTac Hotels LLC, G6 Hospitality Property, LLC, and Motel 6 Operating, L.P.—acted as the actual agents of G6 Defendants when operating their respective subject Motel 6 properties identified herein and in committing the wrongful acts and inactions alleged herein.

255. Hawthorn Suites Owners—HSK212, LLC and Lala Salama Hospitality, Inc—acted as the actual agents of Wyndham Hotel & Resorts, Inc. when operating the subject Hawthorn Suites hotel property identified herein and in committing the wrongful acts and inactions alleged herein.

256. Through the wrongful acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees, Motel 6 Defendants, to operate their respective subject Motel 6 properties

257. Through the wrongful acts and omissions described throughout this Complaint, Wyndham Hotel & Resorts, Inc. exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its

franchisees, Hawthorn Suites Owners, to operate their respective subject Hawthorn Suites hotel property.

258. G6 Defendants are vicariously liable for the TVPRA violations of their franchisees, the Motel 6 Defendants, and the subagents of such franchisees.

259. Wyndham Hotel & Resorts, Inc. is vicariously liable for the TVPRA violations of their franchisees, the Hawthorn Suites Owners Defendants, and the subagents of such franchisees.

260. Additionally, on information and belief, each of the parent hotel Defendants, G6 Defendants and Wyndham Hotel & Resorts, Inc., participated in a joint venture with each of their franchisees, operating each of the respective and applicable subject locations: the subject three Motel 6s and the subject Hawthorn Suites. They each had highly integrated operations at the hotels, shared revenue and profits generated from the hotels and exercised mutual control over the sex trafficking venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another with each of their franchisees and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

## JOINT AND SEVERAL LIABILITY

261. Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 260.

262. "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[49] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[50]

---

[49] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).
[50] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

263.    Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[51]

264.    Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of her injuries and damages alleged herein.

## DAMAGES

265.    Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiff to sustain legal damages.

266.    Plaintiff did suffer the following injuries as a direct and proximate result of Defendants, and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

> a.  actual damages;
>
> b.  direct damages;
>
> c.  incidental and consequential damages;
>
> d.  lost earnings and lost earning capacity;
>
> e.  necessary medical expenses;
>
> f.  life care expenses;
>
> g.  physical pain and suffering;
>
> h.  physical impairment;
>
> i.  mental anguish and emotional distress damages (until trial and in the future);

---

[51] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

      j.   restitution;

      k.   unjust enrichment; and

      l.   disgorgement of profits.

267.    Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

## PUNITIVE DAMAGES

268.    Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## ATTORNEY FEES

269.    Plaintiff is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

270.    All conditions precedent to Plaintiff's recovery of its costs and attorney's fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

271.    Plaintiff requests a jury trial in this action.

## PRAYER

272.    For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

      a.   all economic damages to which she is entitled;

      b.   all actual damages to which she is entitled;

      c.   all incidental and consequential damages to which she is entitled;

d.  all mental anguish and emotional distress damages to which she is entitled;

e.  all restitution damages to which she is entitled;

f.  all disgorgement of profits to which she is entitled;

g.  all unjust enrichment damages to which she is entitled;

h.  exemplary, treble, and/or punitive damages;

i.  attorneys' fees and costs of suit;

j.  pre-judgment and post-judgment interest at the highest rate allowed by law; and

k.  all other relief to which she is or may be entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: February 24, 2025       By:   *Stephen J. Hill*

Gerald Singleton (WA 59010)
Stephen J. Hill (WA 7651)
Meagan Verschueren (CA 313117) Pro Hac Vice applicant
Katie Llamas (CA 303983) Pro Hac Vice applicant
Attorneys for Plaintiffs