1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

JANE DOE,

12

Plaintiff,

v.

13

G6 HOSPITALITY PROPERTY LLC et al.,

14

Defendants.

15

CASE NO. 2:25-cv-00347-LK

ORDER ON WYNDHAM'S AND
HSK212'S MOTIONS TO DISMISS

16        This matter comes before the Court on Defendants Wyndham Hotels and Resorts Inc.'s

17   and HSK212, LLC's motions to dismiss. Dkt. Nos. 27, 54. As explained below, HSK212's motion

18   is granted because HSK212 does not legally exist. Wyndham's motion is granted in part—the

19   Court finds that the complaint does not plausibly allege that Wyndham is directly liable as a

20   perpetrator or beneficiary, but does state a claim that Wyndham is indirectly liable based on

21   vicarious liable principles.

22                            I.    BACKGROUND

23   **A.    Factual Background**

24        Jane Doe brings this action under the Trafficking Victims Protection Reauthorization Act

1    ("TVPRA") against several hotels and their parent companies. Dkt. No. 1 at 7.[1] She alleges that

2    from 2017 to 2019, she was "rotated between" four different Seattle-area hotels—one Hawthorn

3    Suites and three Motel 6 hotels:

4         (1) Hawthorn Suites at 6329 S 212th Street, Kent, Washington, 98032;

5         (2) Motel 6 at 20651 Military Road South, SeaTac, Washington; 16500;

6         (3) Motel 6 at Pacific Highway South, Seattle, Washington; and

7         (4) Motel 6 at 18900 47th Avenue South, SeaTac, Washington.

8    *Id.* at 3–6, 16. These motions to dismiss only involve the Hawthorn Suites hotel, not the three

9    Motel 6 hotels, which are associated with other defendants in this action.

10        Doe alleges that traffickers rented rooms at each of these four hotels to harbor and exploit

11   her for commercial sex acts. *Id.* at 3, 78. She alleges that the traffickers operated with apparent

12   ease, as hotel staff "observed or should have observed" buyers "parading in and out" of rooms for

13   weeks and years without intervention. *Id.* at 47–48, 73–74. Defendants allegedly profited from this

14   venture, as "each and every room" rented to the traffickers brought in revenue. *Id.* at 47, 73. Doe

15   alleges that she suffered physical, psychological, and financial harm—she is left with "nightmares,

16   fears, uncontrollable triggers" and a life forever altered by the trauma. *Id.* at 79. She alleges that

17   Defendants are jointly and severally liable for damages under the TVPRA. *Id.*

18        Hawthorn Suites is a franchise operated by Wyndham. *Id.* at 6. HSK212 operated the 212th

19   Street location from 2018 to 2021. *Id.* at 4. Wyndham and HSK212 are not affiliated with the three

20

---

21   [1] Jane Doe has used this pseudonym since filing this lawsuit. As Wyndham correctly points out in its motion to dismiss,
22   Dkt. No. 27 at 3 n.1, Local Civil Rule 7 requires a motion before relief can be granted; a plaintiff cannot simply embed
     such request for relief in her complaint. *See Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 596 F.3d 1036,
     1042 (9th Cir. 2010) ("The normal presumption in litigation is that parties must use their real names."); Fed. R. Civ.
23   P. 10(a) ("The title of the complaint must name all the parties."); *Does I Thru XXIII v. Advanced Textile Corp.*, 214
     F.3d 1058, 1067 (9th Cir. 2000) (noting that the use of "fictitious names" generally contravenes both Rule 10(a) and
24   "the public's common law right of access to judicial proceedings"). Doe has since filed such a motion, which the
     Court will rule on in a separate order.

Motel 6 locations listed above. Based on their alleged roles in her sex trafficking at the 212th Street Hawthorn Suites location, Doe brings TVPRA claims against both Wyndham and HSK212 on "perpetrator" and "beneficiary" liability theories. *Id.* at 4, 6, 62–64, 79–83. She brings these claims both directly and indirectly. The direct claims are based on Wyndham's and HSK212's own acts and knowledge, whereas the indirect claims are based on vicarious liability principles and seek to hold Wyndham and HSK212 responsible for each other's (and Lala Salama Hospitality, Inc.'s[2]) acts and knowledge. *See id.* at 79–80 (Count 1, perpetrator liability), 80–81 (Count 2, beneficiary liability), 82–83 (Count 3, vicarious liability). The complaint groups the allegations against HSK212 and Lala Salama together and refers to them as the "Hawthorn Suites Defendants" or "Hawthorn Suites Owners." *Id.* at 4.

**B.    Procedural Background**

Doe filed her complaint on February 24, 2025. Dkt. No. 1. The Motel 6 Defendants and one of the two Hawthorn Suites Defendants—Lala Salama—all answered the complaint. Dkt. Nos. 39, 44, 50. Wyndham and HSK212 moved to dismiss. Dkt. Nos. 27, 54.

## II.    DISCUSSION

**A.    Jurisdiction**

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Doe asserts federal law claims under the TVPRA, 18 U.S.C. § 1595. Dkt. No. 1 at 7, 79–84.

Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred in this judicial district (all four hotels are located in this district). 28 U.S.C. § 1391(b)(2).

---

[2] Lala Salama operated the 212th Street Hawthorn Suites from 2013 to 2018. *Id.* at 4.

1    **B.    Legal Standards**

2       When deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a court must

3    assume the truth of the complaint's factual allegations and credit all reasonable inferences arising

4    from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The court "need not

5    accept as true conclusory allegations that are contradicted by documents referred to in the

6    complaint." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

7    Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible

8    on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible

9    "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

10   that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

11   (2009). Although "detailed factual allegations" are not required, a complaint must include "more

12   than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* A complaint "that offers

13   'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

14   do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

15   **C.    The Parties Failed to Meet and Confer as Required by this Court's Standing Order**

16       In its motion to dismiss, Wyndham states that on the morning it filed its motion, it "sent to

17   Plaintiff's counsel notice of the intent to file the present motion and a statement of the basis for

18   dismissal," which "also invited a further meet and confer." Dkt. No. 27 at 21. When Plaintiff's

19   counsel "indicated that it sought to further meet and confer, but did not timely agree to a one-week

20   extension to W[yndam]'s deadline to respond to the Complaint so that the parties c[ould]

21   meaningfully meet and confer," Wyndham filed the motion "to comply with its deadline to respond

22   to the Complaint." *Id.*

23       The Local Civil Rules define a "Meet and Confer" as "a good faith conference *in person*

24   *or by telephone* to attempt to resolve the matter in dispute without the court's involvement." LCR

1(c)(6) (emphasis added). Despite this requirement, counsel never talked to each other. An email exchange does not comply with the Court's Standing Order or with Local Civil Rule 1.

The Court's meet-and-confer requirement "is not a meaningless formality, nor is it optional; instead, the purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system." *In re Glumetza Antitrust Litig.*, No. 19-CV-05822-WHA (RMI), 2020 WL 3498067, at *5 (N.D. Cal. June 29, 2020); *see also Cont'l Cas. Co. v. Titan Worldwide, LLC*, No. 2:24-cv-01158-LK, 2025 WL 790214, at *3 (W.D. Wash. Mar. 12, 2025). To be sure, a pre-filing meet-and-confer "may not avoid or even significantly narrow every motion," but counsel "are not excused from their obligation to meet and confer simply because they believe meeting and conferring would probably not moot an anticipated motion." *Mollica v. Cnty. of Sacramento*, No. 2:19-CV-02017-KJM-DB, 2022 WL 15053335, at *1 (E.D. Cal. Oct. 26, 2022). Both parties must cooperate to ensure a meaningful meet and confer occurs, and here, neither did.

Going forward, the Court will summarily deny motions that are not preceded by a meaningful, substantive discussion about the motion. This includes dispositive motions, Dkt. No. 23-1 at 4, and any other motions for which a meet and confer is required under the Local Civil Rules, *see, e.g.*, LCR 37 (discovery motions). The Court also cautions counsel that it may impose sanctions for future violations of its Standing Order.

Finally, the Court reminds both parties that it expects "a high degree of professionalism and civility from the lawyers practicing before this court[.]" LCR 83.1(d)(2); *see also* Introduction to the Local Civil Rules ("There should be no difference between the professional conduct of counsel when appearing before the court and when engaged outside it whether in discovery or any

other phase of a case."). Although Wyndham could have sought an extension of time to answer the complaint, Doe could have easily extended the professional courtesy of an extension of time—especially in light of Local Civil Rule 7(j), Section II of the Court's Standing Order, Dkt. No. 23 at 3, and the fact that the Standing Order was issued four business days before the answer was due, Dkt. No. 23. *See also McCullers v. Koch Foods of Ala., LLC*, No. 1:24-cv-01496, 2024 WL 4907226, at *1 (N.D. Ala. Nov 26, 2024) ("Judges rightly expect lawyers to handle minor procedural issues like extensions without unnecessary conflict[.]").

**D.    HSK212 Lacks the Capacity to Be Sued Under Nevada Law**

Based on Nevada law, HSK212 argues that Doe's "window to file suit against HSK212 expired on April 22, 2024." Dkt. No. 54 at 1. HSK212 was a limited liability company organized in Nevada that dissolved in April 2022. *Id.* at 6–7. According to HSK212, Nevada law "provides that a limited liability company has the capacity to be sued for two years following the date of its dissolution," which would have been April 2024. *Id.* at 7. Because Doe filed her complaint in February 2025, HSK212 argues that her claims against it are time-barred. *Id.*

Section 86.505(1) of the Nevada Revised Statutes provides, in relevant part, that:

> The dissolution of a limited-liability company does not impair any remedy or cause of action . . . commenced, within 2 years after the effective date of the articles of dissolution, with respect to any remedy or cause of action as to which the plaintiff learns, or in the exercise of reasonable diligence should have learned of, the underlying facts on or before the date of dissolution . . . Any such remedy or cause of action not commenced within the applicable period is barred.

Doe responds that Section 86.505(1) is inapplicable because Washington law applies, not Nevada law, and Washington law allows suits against dissolved limited liability companies for three years following dissolution. Dkt. No. 56 at 19–22 (citing Wash. Rev. Code § 25.15.309).[3]

---

[3] Doe characterizes both the Washington and Nevada statutes—Section 25.15.309 Revised Code of Washington and Section 86.505 of the Nevada Revised Statutes—as "statutes of limitations." *See* Dkt. No. 56 at 19–22. The statutes' texts make clear that they are "prolongation" statutes that provide time for plaintiffs to sue after an LLC's dissolution,

Dissolution of an LLC implicates two distinct legal concepts: capacity to be sued and legal existence. The Federal Rules of Civil Procedure differentiate between these two concepts. "For instance, Rule 17(b)(3)(A) permits courts to imbue unincorporated associations and partnerships with the capacity to sue. But this power does not extend to entities that lack legal existence." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382 (2d Cir. 2021). "Likewise, Rule 9 lists the two terms independent of one another, indicating that they are distinct concepts with distinct meanings." *Id.* at 383 (citation modified). Because "[t]he most elemental requirement of adversary litigation is that there be two or more parties," absent "legal existence, there can be no Article III case or controversy." *House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 787 (4th Cir. 2019) (citation modified). Thus, a party "must first be found to have legal existence before the question of capacity to sue or be sued can arise." *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001); *see also D&T Partners, LLC v. Baymark Partners, LP*, No. 3:21-CV-1171-B, 2022 WL 1778393, at *2 n.4 (N.D. Tex. June 1, 2022) ("The issue presented in this case—legal existence—should not be confused with capacity to sue or be sued. . . . While Rule 17(b)(3)(A) could reasonably be read as supplying a nonexistent entity with capacity, it does not confer legal existence to a nonexistent entity nor authorize suits against nonexistent defendants."); *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110 (S.D.N.Y. 1992) ("Rule 17(b) does not confer legal existence or create new types of legal entities.").

As the Ninth Circuit has observed, "[a]fter a specified period post-dissolution," an LLC "ceases to exist." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1037 (9th Cir. 2010). Legal existence is not a choice of law question, as Doe suggests. Dkt. No. 56 at 19. Rather "[w]hether a juridical entity like a limited liability company has 'legal existence' is determined by reference to

---

rather than limiting an otherwise longer timeframe. *See Sec. & Exch. Comm'n v. Lidingo Holdings, LLC*, No. C17-1600 RSM, 2018 WL 2183999, at *2–4 (W.D. Wash. May 11, 2018).

1    the law under which it was created." *DHIP, LLC v. Fifth Third Bank*, No. 19-CV-2087 (VSB),

2    2021 WL 4481118, at *5 (S.D.N.Y. Sept. 30, 2021). Here, HSK212 was organized in Nevada.

3    Dkt. No. 55 at 1, 5–6; Dkt No. 56 at 21. Accordingly, Nevada law determines HSK212's legal

4    existence. As discussed above, Section 86.505(1) of the Nevada Revised Statutes permits an LLC

5    to be sued for up to two years following dissolution "with respect to any remedy or cause of action

6    as to which the plaintiff learns, or in the exercise of reasonable diligence should have learned of,

7    the underlying facts on or before the date of dissolution." *See also Coto Settlement*, 593 F.3d at

8    1037 (citing same for the proposition that an "LLC may sue and be sued until 2 years after

9    dissolution").[4] HSK212 therefore existed for purposes of suing and being sued for two years after

10   its dissolution.

     The complaint establishes that Doe knew about the facts underlying her claim between

11   2017 and 2019. Dkt. No. 1 at 3, 16–19. April 22, 2022 is the effective date of HSK212's articles

12   of dissolution. Dkt. No. 55 at 6. Doe had two years from that date to file suit, *see* NRS § 86.505(1),

13   but she did not do so, and her claims are therefore barred. HSK212 is dismissed from this action.[5]

14

15   **E.    The Complaint Adequately Alleges Perpetrator and Beneficiary Liability Under a Vicarious Liability Theory, But Not Otherwise**

16   Section 1595 creates two kinds of civil liability: perpetrator liability and beneficiary

17   liability:

18

19

---

20   [4] The Court also notes that under Section 23.95.500 of the Revised Code of Washington, Washington is "not authorize[d] . . . to regulate the organization or internal affairs of a foreign entity registered to do business in this

21   state." The "internal affairs" of a company include the effect of dissolution and termination. *See, e.g.*, *Berschauer Phillips Constr. Co. v. Concrete Sci. Servs. of Seattle, LLC*, Nos. 64812–8–I, 65012–2–I, 2011 WL 1107228, at *2

22   n.2 (Wash. Ct. App. 2011). That rule accords with the principle that the existence of an LLC is determined by reference to the law under which it was created.

23   [5] Doe also argues that HSK212's motion is untimely because it was not filed until "almost four months" after HSK212 was served with the complaint. Dkt. No. 56 at 11. But "a defendant-entity that ceases to exist before process is

24   effectuated under Federal Rule 4 is necessarily incapable of being served, making any resulting judgments entered against it void." *D&T Partners, LLC*, 2022 WL 1778393, at *2 n.4.

- Perpetrator Liability. Since it was enacted, the statute has allowed the victim to sue "the perpetrator." 18 U.S.C. § 1595(a). A "perpetrator" is an individual or entity that directly commits a violation of Section 1591(a), which criminalizes knowingly causing a person to engage in a commercial sex act through force, fraud, or coercion, or engaging in such acts with a minor. *See id.* § 1591(a). To establish civil perpetrator liability, the plaintiff must show that the defendant either (1) committed an act prohibited under Section 1591(a)(1), such as knowingly harboring, maintaining, or transporting a victim or commercial sex acts using force, fraud, or coercion, or (2) engaged in a venture under Section 1591(a)(2) that facilitated such acts, knowing or in reckless disregard of the trafficking. *See id.*; *see also, e.g.*, *C.C. v. Rashid*, No. 2:23-CV-02056-GMN-BNW, 2024 WL 5200543, at *9 (D. Nev. Dec. 20, 2024) ("the term 'perpetrator' includes anyone who is criminally liable under either § 1591(a)(1) or § 1591(a)(2)").

- Beneficiary Liability. Congress amended the statute in 2008 to allow the victim to sue "whoever knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter," which includes Section 1591(a). 18 U.S.C. § 1595(a). That amendment "made it easier for victims of trafficking violations to bring civil suits including by broadening the parties who could be sued for trafficking violations[.]" *Doe A v. Seatac Hotels LLC*, No. C24-1270 MJP, 2025 WL 474233, at *3 (W.D. Wash. Feb. 12, 2025) (citation modified). To succeed on a beneficiary liability theory, the plaintiff must show that the defendant (1) knowingly benefitted (2) from participation in a venture (3) which they knew or should have known was engaged in conduct that violated the TVPRA. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175 (9th Cir. 2022) (citing 18 U.S.C. § 1595(a)).

The complaint alleges that Wyndham is liable under both "perpetrator" and "beneficiary" liability theories. *See* Dkt. No. 1 at 79–80 (Count 1, perpetrator liability), 80–81 (Count 2, beneficiary liability).[6] That is, Wyndham—based on its own activities such as its "audits, investigations and inspections of the subject Hawthorn Suites" and its awareness "that sex trafficking is a problem in the hotel industry and at [its] hotels" in general—knew that it was harboring Doe for sex trafficking (perpetrator liability claim) and knew or should have known that it was deriving a financial benefit from her trafficker's activities and was participating in that venture (beneficiary liability claim). Dkt. No. 1 at 53; *see also id.* at 79–81. Doe also alleges that Wyndham is liable under both theories based on vicarious liability principles, making Wyndham responsible for the knowledge and actions of the Hawthorn Suites owners and hotel staff. *Id.* at 66–72, 82–83.

### 1. Doe is a Victim as Defined by the TVPRA

As a threshold matter, Doe plausibly alleges that she is a victim of sex trafficking under 18 U.S.C. § 1591(a). A victim is sex trafficked if they are "caused to engage" in commercial sex acts either while under 18 years of age or due to force, threat of force, fraud, or coercion. 18 U.S.C. § 1591(a). She plausibly alleges that her traffickers used force, threats of force, and coercion to make her engage in commercial sex acts. *See generally* Dkt. No. 1. Thus, she is a "victim" with standing to sue under the TVPRA.

### 2. Vicarious Liability

The TVPRA does not explicitly address the issue of vicarious liability, but "statutes are presumed not to disturb the common law, unless the language of a statute [is] clear and explicit for

---

[6] Doe also labels as a "cause of action" her vicarious liability theory. *Id.* at 82-83. "It is well established that vicarious liability is a theory of liability, not a cause of action"; therefore, this "claim" is dismissed. *Bielicki v. USAA Cas. Ins. Co.*, No. 2:23-CV-01362-CDS-EJY, 2024 WL 3104576, at *6 (D. Nev. June 24, 2024).

this purpose." *State Eng'r of Nev. v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nev.*, 339 F.3d 804, 814 (9th Cir. 2003) (citation modified). Indeed, "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Many courts have found that vicarious liability principles apply to the TVPRA. *See, e.g.*, *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, No. 5:24-CV-06993-PCP, 2025 WL 2539010, at *4 (N.D. Cal. Sept. 4, 2025); *Doe v. Wyndham Hotels & Resorts, Inc.*, No. 24-CV-217 JLS (AHG), 2025 WL 824369, at *16 (S.D. Cal. Mar. 14, 2025); *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-00672-KJM-JDP, 2022 WL 10626493, at *5 (E.D. Cal. Oct. 18, 2022).

Here, the complaint's vicarious liability allegations are "based on a franchise relationship" between Wyndham (the franchisor) and the Hawthorn Suites Defendants (the franchisees). Dkt. No. 27 at 17 (citing Dkt. No. 1 at 50, 64–72, 82–83). Although no party identifies what state law applies to the franchise agreements between Wyndham and its franchisees, the law both parties cite generally concludes that an agency relationship will exist if the franchisor has the right to substantially control its franchisee. *See, e.g.*, Dkt. No. 34 at 23 (citing *J.M.*, 2022 WL 10626493, at *5); Dkt. No. 27 at 18 (citing *Douglass v. Patel*, No. 04-CV-322-D, 2006 WL 8432446, at *3 (D. Wyo. Jan. 6, 2006)); *see also Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448 (9th Cir. 2018) (Generally, "[f]or an agency relationship to exist, an agent must have authority to act on behalf of the principal and the person represented must have a right to control the actions of the agent." (citation modified; quoting *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) and Restatement (Third) of Agency § 1.01 cmt. c)); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 939 (D. Or. 2020) ("To state a claim for vicarious liability [under the TVPRA] under an agency theory, [a] [p]laintiff must plausibly allege that

(1) [d]efendants and their corresponding hotels were in an agency relationship, and (2) the hotels or hotel staff are plausibly liable under § 1595.").

As other courts have noted, "some degree of control by the franchisor over the franchisee is inherent" and "does not necessarily trigger" a principal-agent relationship. *S.C. v. Hilton Franchise Holding LLC*, No. 2:23-CV-02037-APG-DJA, 2024 WL 4773981, at *7 (D. Nev. Nov. 12, 2024) (citation modified); *see also Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 728–29 (11th Cir. 2021) (franchisors do not owe a duty to patrons of the franchise unless "the franchisor retains a right to control the day-to-day operations of the franchise"); *Doe v. Wyndham Hotels & Resorts*, No. 2:23-CV-01676-DAD-CSK, 2025 WL 85831, at *11 (E.D. Cal. Jan. 7, 2025) ("In the TVPRA context, the franchisor-franchisee relationship is not a principal-agent relationship unless the franchisor exercises control over the day-to-day operations of the franchisee such that it controls the instrumentality that caused the plaintiff's harm." (citation modified)); *Folsom v. Burger King*, 958 P.2d 301, 309 (Wash. 1998) (franchisor did not owe any duty to franchisor's employee where "the franchisee ha[d] the power to control the day-to-day operations, and where the franchisee own[ed] the business equipment, operate[d] the business, h[e]ld[] the operating licenses and permits, determine[d] the wages, provide[d] for the basic training and insurance for the franchisee's employees, and hire[d], fire[d], supervise[d], and discipline[d] the employees," and where franchisor "simply had the authority to require the franchisee to adhere to the '[franchisor's] system' and did not control the daily operations"). Instead, courts focus on "the degree of control the franchisor has over the franchisee's day-to-day operations with respect to the instrumentality, conduct, or specific aspect of the franchisee's business that caused the plaintiff's injury." *S.C.*, 2024 WL 4773981, at *7. For example, in another TVPRA case, the plaintiff sufficiently established an agency relationship between the defendant-franchisors (Hilton, Wyndham, Marriott, among others) and their branded hotels by alleging that they "exercised control over the

means and methods of daily hotel activities by hosting online bookings, making employment

decisions, advertising for employment, controlling training and policies, specifying how to build

and maintain hotel facilities, and regularly inspecting hotel facilities." *A.B. v. Hilton Worldwide*

*Holdings Inc.*, 484 F. Supp. 3d 921, 940 (D. Or. 2020); *see also e.g., J.M.*, 2022 WL 10626493, at

*5 (collecting cases and holding that the plaintiff sufficiently pleaded an agency relationship where

the "defendants exercised control over the day-to-day operations of the hotels by hosting online

bookings, setting hotel employee wages, making employment decisions for the hotels, providing

standardized training methods for hotel employees, and fixing hotel room rent prices"); *Doe A v.*

*Seatac Hotels LLC*, 2025 WL 474233, at *6 (similar).

In support of her vicarious liability theory, Doe alleges that Wyndham exerted extensive

control over the Hawthorn Suites Defendants. Dkt. No. 1 at 64. Wyndham set standards for

operations, including

> things like the temperature at which coffee shall be served, room rates,
> documentation to be kept, how to handle crime, how to report crime, policies and
> procedures for staff to follow in response to suspected criminal activity, policies
> and procedures related to staff and employees engaging in criminal activity,
> employee and agent training, public relations and responses, and to the number of
> pillows that are placed on the beds, to the types of payments accepted, to when,
> where, and how guests are greeted and how and where guests must park.

*Id.* Wyndham also required the Hawthorn Suites Defendants "to use a Guest Relations

Application/software owned, operated, and maintained by Wyndham Hotel & Resorts, Inc. to

manage all guest data and information." *Id.* at 70. That system "receive[s] reservations, process[es]

payment transactions, get[s] data about guests, and get[s] data about crime and other incidents of

concern, including human trafficking." *Id.* at 66. Wyndham also required the Hawthorn Suites

Defendants "to install, and use certain brands, types, make, and/or models of hardware, software,

peripheral equipment, data storage, data sharing devices and software and support services to

perform internal operating functions at the subject Hawthorn Suites[.]" *Id.* at 68. With respect to

staff, Wyndham "dictated which [staff] positions must perform which tasks and how they must do so," "set requirements for the hiring process used by Hawthorn Suites Owners," and "oversaw employee discipline processes and terminations[.]" *Id.* at 69.

Doe argues that "a majority of district courts have found nearly identical allegations sufficient to plead an agency relationship, i.e., that [Wyndham] exercised control over the day-to-day operations of [Hawthorn Suites] by hosting online bookings, setting hotel hiring requirements, making employment decisions for the hotel[], overseeing disciplinary action and termination of hotel employees, providing standardized training methods for hotel employees, and fixing hotel room rent prices." Dkt. No. 34 at 23 (citing Dkt. No. 1 at 56, 64–72). The Court agrees, although it is skeptical that the franchise agreement at issue truly goes beyond that necessary to protect Wyndham's trademarks, as Doe alleges. Dkt. No. 1 at 67. Nevertheless, the Court finds that the allegations regarding vicarious liability suffice to survive a motion to dismiss.

### 3. Joint Employer and Alter Ego Liability

Doe also alleges that "Wyndham and Hawthorn Suites Owners defendants were at all times relevant, a single and joint employer for the periods of time that each Hawthorn Suites Owner owned the subject hotel," and that they "functioned as a single integrated entity and/or as alter-egos of one another[.]" *Id.* at 50, 83. If so, it follows that both Wyndham and the Hawthorn Suites Defendants were "actually aware" that Doe was trafficked for sex at Hawthorn Suites because the hotel employees—which they jointly employ—plausibly had actual knowledge of the trafficking.

Courts analyzing TVPRA joint employer theories have looked to Title VII cases for guidance. *See, e.g.*, *S.C.*, 2024 WL 4773981, at *8. In the Title VII context, "the principal guidepost" in determining whether a joint employer relationship exists "is the element of control . . . over the details of the work of the other." *U.S. Equal Emp. Opportunity Comm'n v. Glob.*

*Horizons, Inc.*, 915 F.3d 631, 638 (9th Cir. 2019) (citation modified). Courts can consider several non-exhaustive factors, including

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* (citation modified); *see also*, *e.g.*, *A.B.*, 484 F. Supp. 3d at 942–43 (plaintiff sufficiently alleged that hotel brands and their branded properties could be held liable as joint employers based on allegations that they had "interrelated, intermingled, and unified operations" and the hotel brands (e.g., Hilton, Wyndham) had "authority to exercise control over conditions of employment [at the branded properties at which A.B. was trafficked] such as training, setting employee wages, advertising for employment, and making employment decisions");[7] *S.C.*, 2024 WL 4773981, at *8 (similar).

Here, Doe's allegations suffice to show a joint employer relationship at this stage, particularly the allegations that Wyndham (1) "established detailed job descriptions for several positions in its Hawthorn Suites hotels," (2) "set requirements for the hiring process used by Hawthorn Suites Owners and property management companies, and oversaw employee discipline processes and terminations," (3) "controlled training provided by Hawthorn Suites Owners to hotel staff by dictating the content of that training, especially related to crime and/or human trafficking," and (4) "retained sole discretion to determine whether all training had been completed satisfactorily," which gave Wyndham a functional veto over all employee hires. Dkt. No. 1 at 67–

---

[7] In *A.B.*, the joint employer claim failed for lack of allegations showing that anyone—the hotel brands, the branded properties, or hotel staff at the properties—knew or should have known about A.B.'s trafficking. *Id.* at 943.

72; *S.C.*, 2024 WL 4773981, at *8 (requirement that "[a]ll employees must complete [a specified] training to Hilton's satisfaction[] effectively allow[ed it] a veto over all employee hires").

However, Doe's allegations do not suffice to show alter ego liability. "To pierce the corporate veil and find a parent corporation liable, the party seeking relief must show that there is an overt intention by the corporation to disregard the corporate entity in order to avoid a duty owed to the party seeking to invoke the doctrine." *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, No. C08-1372 RSM, 2010 WL 2079694, at *5 (W.D. Wash. May 20, 2010) (quoting *Minton v. Ralston Purina Co.*, 47 P.3d 556, 562 (2002)). Doe's conclusory allegations do not support such a finding. Dkt. No. 1 at 83. "The absence of alleged facts is even more notable in light of the requirement that corporate veil piercing theories generally sound in fraud and need to be pleaded under Rule 9's heightened pleading requirements." *Advanced Hair Restoration LLC v. Bosley Inc.*, No. C23-1031-KKE, 2025 WL 593098, at *2 (W.D. Wash. Feb. 24, 2025); *see also Doe (G.N.C.) v. Uniquest Hosp., LLC*, No. 23-CV-7980 (PKC), 2024 WL 4149251, at *5 (S.D.N.Y. Sept. 11, 2024) ("Conclusory allegations of alter ego status are not actionable."); *Hadnagy v. Moss*, No. 2:23-CV-01932-BAT, 2024 WL 1328568, at *6 (W.D. Wash. Mar. 28, 2024) (rejecting allegations made on "information and belief" that merely repeated the elements and associated factors to pierce the corporate veil).

Because Doe has sufficiently alleged vicarious liability or joint employer liability, she has adequately stated a claim if her allegations show perpetrator or beneficiary liability on the part of the Hawthorne Suites Defendants.

### 4. Perpetrator Liability

Wyndham argues that Doe does not plausibly allege a perpetrator liability claim against it. Dkt. No. 27 at 7. The Court agrees in part—the allegations against Wyndham do not plausibly show that it "knowingly harbored" her or that it knowingly or recklessly "engaged in a venture"

to facilitate her trafficking. But the complaint sufficiently alleges vicarious liability based on allegations about the hotel staff's actions and knowledge in combination with the principal-agent and/or joint employer relationship discussed above.

As noted, to state a Section 1595(a) claim under a perpetrator liability theory, Doe must allege that Wyndham is either a direct violator under Section 1591(a)(1) or a participant under Section 1591(a)(2). *See C.C.*, 2024 WL 5200543, at *11; *see also Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *13 (evaluating perpetrator liability claim against hotel); *B.J. v. G6 Hosp., LLC*, No. 22-CV-03765-MMC, 2023 WL 6120682, at *11 (N.D. Cal. Sept. 18, 2023) (same); *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-00672-KJM-JDP, 2023 WL 3456619, at *2 (E.D. Cal. May 15, 2023) (same). Both the direct violator and participant theories require showing "actual knowledge[.]" *C.C.*, 2024 WL 5200543, at *11; *see also B.J.*, 2023 WL 6120682, at *11. In evaluating whether a hotel had "actual knowledge" of the trafficking, "district courts tend to look beyond allegations of 'red flag' signs that should have put a [hotel] on notice of sex trafficking, and in particular focus on allegations regarding hotel staff actions or duration and age that are suggestive of actual knowledge of sex trafficking." *Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *13 (citing cases).

Wyndham argues that Doe does not sufficiently allege actual knowledge of sex trafficking. Dkt. No. 27 at 7–8. It contrasts Doe's case with *Ricchio v. McLean*, in which the hotel operators witnessed the trafficker "grab [the plaintiff], kick her, and force her back toward the rented quarters when she had tried to escape" and then "enthusiastically" exchanged "high-fives" in the hotel parking lot with the trafficker "while speaking about 'getting this thing going again,' in circumstances in which [the trafficker's] coercive and abusive treatment of [the plaintiff] as a sex slave had become apparent to the [hotel operators]." 853 F.3d 553, 555 (1st Cir. 2017). According to Wyndham, "[n]o such allegations are present here." Dkt. No. 27 at 8.

The Court agrees with Wyndham only in part. The complaint's allegations plausibly demonstrate that hotel staff had actual knowledge of Doe's trafficking, but not that Wyndham had actual knowledge of the same. As to the hotel staff, for example, the complaint alleges that

- Doe resided in the hotel for weeks at a time, with "buyers parading in and out of hotel rooms to engage in the sex trafficking," which was obvious to hotel staff and even other guests at the hotel, many of whom left Google or Tripadvisor reviews warning of the presence of drugs and prostitution, with one reviewer stating that "if you want hookers and drugs this is the place to stay." Dkt. No. 1 at 55, 62, 73–74.[8]

- She was "consistently beaten by her trafficker, which would be loud events and regularly left visible bruises and marks on different parts of her body," and she was "burned multiple times with a cigarette, leaving her with visible wounds and eventual scars." *Id.* 16–17. She was also "shot in the leg" (at a different hotel), leaving her with a visible limp. *Id.* at 16.

- Her trafficker "specifically knew someone working at the front desk" and "just had to call this employee directly to get the room or rooms he wanted and did not even have to check in at the front desk." *Id.* at 17.

- She "looked much younger than her actual age and would have appeared to any reasonable person to be a minor." *Id.* at 63.

These are just some of the relevant allegations, and they suffice to show that at least the hotel staff had actual knowledge of her trafficking. *See J.M.*, 2023 WL 3456619, at *2 (finding that the plaintiff plausibly pleaded the hotel's actual knowledge where she alleged that hotel staff "[r]ented plaintiff and her trafficker rooms away from other guests" as well as witnessed and overheard physical abuse, among other allegations); *S.C.*, 2024 WL 4773981, at *6 (same, where complaint alleged that Hampton Inn employees had the opportunity to observe plaintiff—who looked visibly younger than 18—as she strode past the front desk to meet sex purchasers three times per week for a year); *cf. Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *14 (no

---

[8] As Wyndham points out, there is a relevant difference between commercial sex work and sex trafficking. Dkt. No. 35 at 8. But allegations that guests were aware that, at a minimum, the hotel was being used to host commercial sex activities plausibly suggests that the traffickers were not discrete (and did not feel the need to be). Allegations that men were parading in and out to have sex with Doe, combined with those that Doe—a minor who looked even younger than her age—functionally lived at the hotel and walked around with visible bruises and burns easily clears the bar of showing that the hotel staff were aware that Doe was being trafficked, not just engaging in commercial sex work.

1    actual knowledge where plaintiff did not allege "specific details regarding her age or the duration

2    and frequency of her traffickers' activity to support a claim that defendant . . . actually knew, rather

3    than should have known, that it was participating in a sex trafficking venture").

4          On reply, Wyndham tacitly concedes that the allegations sufficiently establish the hotel

5    staff's actual knowledge when it argues that "there are no allegations that [it] (as opposed to hotel

6    staff) observed [Doe's] alleged trafficking or knowingly harbored her." Dkt. No. 35 at 8.

7    According to Wyndham, the allegations about its own knowledge (as opposed to the Hawthorn

8    Suites hotel staff's knowledge) are limited and non-specific: for example, the complaint alleges

9    that Wyndham "conducted regular inspections of the subject Hawthorn Suites during the time

10   [Doe] was trafficked there," Dkt. No. 1 at 53, without specifically alleging that the inspectors saw

11   Doe being trafficked, *see id.* at 8–9. Likewise, Doe argues that Wyndham knew of general police

12   activity at the Hawthorn Suites, but "does not tie that police activity to the alleged venture." *Id.* at

13   6. The Court agrees with Wyndham that these allegations do not suffice to show actual knowledge;

14   they are limited to the sort of "red flag"-type allegations that courts find to be insufficient. *See Doe*

15   *v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *13; *see also, e.g.*, Dkt. No. 1 at 57 (alleging

16   that Wyndham "inspected the property from 2017 through 2019 on multiple occasions and saw the

17   red flags of Plaintiff's and other victims' trafficking and knew or should have known that it was

18   profiting and benefiting from the room rentals that directly resulted from the trafficking of Plaintiff

19   and other sex trafficking victims at the subject Hawthorn Suites").

20         But, as noted above, the complaint sufficiently alleges the hotel staff's actual knowledge,

21   and the complaint's agency and joint employer allegations impute that knowledge to Wyndham.

22   *See Doe v. G6 Hosp., LLC*, No. 2:24-CV-01235-RSL, 2025 WL 1167550, at *6 (W.D. Wash. Apr.

23   22, 2025) (finding that the "G6 defendants are responsible for the conduct of and charged with the

24   knowledge of the staff at the Studio 6 in Mountlake Terrace because they acted as the G6

1  defendants' agents"). Because the Court finds that (1) the complaint sufficiently alleges that

2  Hawthorn Suites Defendants had actual knowledge of Doe's trafficking, and (2) sufficiently

3  alleges that Wyndham was engaged in a principal-agent and/or joint employer relationship with

4  Hawthorn Suites, the Court finds that the complaint sufficiently alleges that Wyndham had actual

5  knowledge and therefore that it plausibly states a perpetrator liability claim against Wyndham.

6        5.  Beneficiary Liability

7        Wyndham also moves to dismiss on the basis that Doe fails to plausibly allege a beneficiary

8  liability claim against it. To succeed on a beneficiary liability theory under Section 1595(a)(2), the

9  plaintiff must show that the defendant (1) knowingly benefitted (2) from participation in a venture

10 (3) which they knew or should have known was engaged in conduct that violated the TVPRA.

11 *Ratha*, 35 F.4th at 1175 (citing 18 U.S.C. § 1595(a)). Wyndham argues that Doe does not plausibly

12 allege either that it "participated in a venture that trafficked [her]" or that it "knew or should have

13 known of th[at] venture." Dkt. No. 27 at 9–16.[9]

14       The Court finds that the complaint does not plausibly allege a direct beneficiary liability

15 claim against Wyndham, but, similar to the above, it does plausibly allege a vicarious liability

16 theory. Specifically, the complaint does not plausibly show that Wyndham directly participated in

17 a venture with Doe's traffickers. But Doe's indirect liability claim against Wyndham is sufficiently

18 stated based on the agency allegations discussed above and sufficient allegations that the Hawthorn

19 Suites Defendants are liable based on a beneficiary liability theory.

20       The second element in the beneficiary liability analysis is the defendant's participation in

21 the venture. Some courts have held that a plaintiff can establish this "(1) by pleading facts from

22

23 _____

24 [9] Wyndham appears to concede the first element of the test—that it "knowingly benefitted." *See generally* Dkt. No. 27. Even if not, the Court finds that element, which is not a particularly high bar in this context, to be met here. *See S.C.*, 2024 WL 4773981, at *3 ("A trafficker renting rooms, or Hilton receiving royalties for that rental, is sufficient to show the defendants knowingly benefitted."); Dkt. No. 1 at 72 (alleging that "Hawthorn Suites locations typically pay a percentage of their total revenue back to the parent company, Wyndham").

1    which a court could infer a common purpose, shared profits and risk, or control, or (2) by showing

2    a direct and continuous relationship that existed between the parties." *Doe A v. Seatac Hotels LLC*,

3    2025 WL 474233, at *4 (citation modified). However, other courts have declined to follow such

4    test, as it is not set out in the statute or binding case law. *See, e.g.*, *K. H. v. Riti, Inc.*, No. 23-11682,

5    2024 WL 505063, at *2 n.5 (11th Cir. Feb. 9, 2024).

6        Wyndham argues that even if there are allegations that "Hawthorn Suites Facility staff may

7    have facilitated [Doe's] trafficking," those allegations do not show that Wyndham—which is one

8    step further removed—did the same. Dkt. No. 35 at 4. The Court agrees; at most, the allegations

9    show that Wyndham was aware that sex trafficking was occurring at its hotels, or that it had the

10    means to detect and stop Doe's trafficking but failed to do so. Dkt. No. 34 at 14–15 (summarizing

11    relevant factual allegations). Neither is sufficient. The TVPRA does not impose an affirmative

12    duty to prevent sex trafficking, *see A.B. v. Wyndham Hotels & Resorts, Inc*., 532 F. Supp. 3d 1018,

13    1027 (D. Or. 2021) (collecting cases), and the allegations otherwise fall short of showing that

14    Wyndham "participated in" this specific venture to traffic Doe. *See Red Roof Inns*, 21 F.4th at

15    719–20, 726–27 (defendant franchisors did not take part in a venture where the plaintiffs alleged

16    that (1) they were trafficked at the hotels that the franchisors licensed to franchisees; (2) the

17    franchisors knowingly benefitted from the percentage of rental revenue that they received from the

18    rooms rented by the traffickers; (3) hotel employees assisted in the trafficking by acting as police

19    lookouts; (4) one of the franchisors sent inspectors to examine the hotel; (5) plaintiffs exhibited

20    several visible signs of being sex trafficking victims; and (6) online reviews of the hotel "reported

21    widespread prostitution and crime occurring at the hotel"; "observing something is not the same

22    as participating in it"); *K. H.*, 2024 WL 505063, at *3–4 (similar). Even if an overt act in

23    furtherance of the venture is not required to "participate" in it, Doe agrees that the allegations must

24

plausibly allege at least a "tacit agreement" between Wyndham and the traffickers. Dkt. No. 34 at 13. In the Court's view, the allegations do not show a tactic agreement.

But the vicarious liability theory is sufficiently well-pleaded. The same allegations that support a perpetrator liability claim against Hawthorn Suites also support a beneficiary liability claim. For example, allegations that Doe resided at the hotel for weeks with buyers "parading in and out" of her room, that she was visibly bruised and walked with a limp, that hotel staff accepted late cash payments from the traffickers, charged them higher rates for rooms in exchange for not being reported, and arranged rooms of their choice without requiring them to check in suffice to show knowledge of and participation in that venture. *See* Dkt. No. 1 at 16–17, 55, 59–60, 62, 73–74.[10]

## F.    The Court Grants Leave to Amend the Direct Liability Claims Against Wyndham

Doe asks for leave to amend the complaint if the Court grants any part of Wyndham's motion to dismiss. Dkt. No. 34 at 5. Wyndham asks that Doe not be allowed leave to amend her claims because this would be her third attempt at pleading these claims against Wyndham. Dkt. No. 35 at 10 (noting that this complaint "is already [Doe's] second bite at the apple, having previously filed these claims against [Wyndham] in a separate litigation," before she voluntarily dismissed the claims and refiled them here); *see also* Dkt. No. 27 at 4.

Because the deadline to amend pleadings was December 8, 2025, Dkt. No. 53 at 1, the liberal amendment procedures afforded by Rule 15 govern the request, *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006). Rule 15(a)(2) directs district courts to "freely give leave when justice so requires." As the language of the rule suggests, the standard for

---

[10] Knowledge in the beneficiary liability context is a lower standard than actual knowledge. *See Ratha*, 35 F.4th at 1177 ("The phrase 'knew or should have known' usually connotes negligence," which is "a less culpable mental state than actual knowledge or recklessness." (citation modified)). Because the Court finds that the allegations plausibly showed that the Hawthorn Suites Defendants had actual knowledge that Doe was being trafficked, the lower beneficiary liability knowledge standard is necessarily met as well.

leave to amend is "very liberal." *AmerisourceBergen*, 465 F.3d at 951. This is because "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation modified).

A district court should deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment[.]" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quotation modified). Evaluation of these factors "should be performed with all inferences in favor of granting the motion [to amend]." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999). However, the amendment factors are not entitled to equal weight. *Eminence Cap., LLC v. Aspeon, In*c., 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam). The Ninth Circuit has repeatedly emphasized that prejudice "carries the greatest weight" and is the "touchstone of the inquiry under [R]ule 15(a)." *Id.* (citation modified); *see also, e.g.*, *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020). Indeed, there is a presumption in favor of amendment absent prejudice or a "strong showing" under the remaining four factors. *Eminence Cap.*, 316 F.3d at 1052. The party opposing amendment bears the burden of showing that amendment is not warranted. *Hedglin v. Swift Transp. Co. of Ariz.*, No. C16-5127-BHS, 2016 WL 8738685, at *1 (W.D. Wash. Nov. 15, 2016).

Granting leave to amend is appropriate here. Wyndham does not directly argue that it would be prejudiced by the Court granting leave to amend and appears to focus on futility. Dkt. No. 35 at 10–11. Although the series of conclusory assertions in Doe's sprawling 86-page complaint raise suspicion that she may be "assert[ing] any and all allegations based on other TVPRA cases filed across the country regardless of the facts at issue in *this* case," as Wyndham

argues, Dkt. No. 35 at 3, the Court disagrees that a direct liability TVPRA claim against a hotel parent company such as Wyndham is necessarily futile. Moreover, there has been no undue delay or bad faith on Doe's part. As such, the Court grants Doe leave to amend her allegations of direct perpetrator and beneficiary liability against Wyndham.

## III.  CONCLUSION

For the reasons explained above, HSK212's motion to dismiss is GRANTED. Dkt. No. 54. Wyndham's motion to dismiss is GRANTED IN PART and DENIED IN PART. Dkt. No. 27. HSK212 is dismissed from this action, and Count 3 is dismissed. Should Doe choose to file an amended complaint, she must do so within 21 days of this Order.

Dated this 10th day of December, 2025.

Lauren King
United States District Judge